**In re CHEMICAL SEPARATIONS CORPORATION, Debtor.**

**CHEMICAL SEPARATIONS CORPORATION, Plaintiff,**

v.

**ROHM AND HAAS COMPANY, Defendant.**

**Bankruptcy No. 3–82–01569.**
**Adv. No. 3–83–0519.**

United States Bankruptcy Court, E.D. Tennessee.

April 5, 1984.

Walker & Walker, P.C., John A. Walker, Jr., Mary C. Walker, Ripley, Tenn., for plaintiff.

Egerton, McAfee, Armistead & Davis, P.C., Celeste H. Herbert, Knoxville, Tenn., for defendant.

## MEMORANDUM

CLIVE W. BARE, Bankruptcy Judge.

At issue is whether, for purposes of 11 U.S.C.A. § 547(b) (1979), the debtor was insolvent when it transferred to the defendant payments totaling $213,541.45 during the 90-day period prior to commencement of its chapter 11 reorganization.

Also in question is whether the wire transfer of $91,223, which was paid to defendant on a Monday after defendant shipped goods on the previous Friday, comes within the purview of either the contemporaneous exchange exception of 11 U.S.C.A. § 547(c)(1) (1979) or the subsequent advance rule of 11 U.S.C.A. § 547(c)(4) (1979). The defendant had refused to make the shipment until the debtor agreed to render immediate payment equal to the value of the goods. However, after the payment was made, the parties agreed to apply the payment to older, past-due invoices pre-dating this particular shipment of goods.

### I

The plaintiff debtor filed its petition for reorganization under chapter 11 of the Bankruptcy Code on October 15, 1982. On June 1, 1983, the debtor in possession commenced this action seeking to avoid under 11 U.S.C.A. § 547 (1979) certain allegedly preferential payments which the debtor made to defendant prior to commencement of its reorganization case.

During the 90-day period preceding the commencement of the debtor's reorganization, the debtor transferred to defendant the disputed payments in the amount of $213,541.45.[1] The payments were for amounts owed on various invoices ranging in date from January 25, 1982, to May 7, 1982.

A portion of the disputed $213,541.45 consisted of a $91,223 wire transfer paid to defendant on July 19, 1982. Shortly before this $91,223 transfer, defendant had refused to make a shipment of Amberlite resin to the debtor because of defendant's concern over the debtor's sizeable past-due indebtedness. According to Carl Hazen, the debtor's president and chief executive officer, timely shipment of the Amberlite was critical to work-in-progress on one of the debtor's contracts. Hazen contacted defendant's credit department and made assurances that if the resin were shipped the debtor would pay immediately upon

---

1. A total of $298,346.35 was transferred by the debtor to defendant. However, the parties have agreed that $84,804.90 of that amount may be set off, under 11 U.S.C.A. § 547(c)(4) (1979), against new, unsecured value given by the defendant to the debtor after the transfers. Thus, only the $213,541.45 is in dispute.

shipment. Relying upon Hazen's assurances, Donald R. Stoll, defendant's general credit manager, approved the shipment of the order. On July 16, 1982, defendant shipped and invoiced a $91,224.20 shipment of Amberlite resin to the debtor.

Hazen could not recall whether he requested that the funds be wired on July 16 (Friday) or on July 19 (Monday). However, the debit ticket pertaining to the transaction bears a stamp indicating that the $91,223 was paid by the ordering bank on July 19, 1982.

Initially, the $91,223 wire transfer was not applied to any particular invoice but was applied generally to the debtor's account. Subsequently, Bill Haley, the debtor's acting comptroller, agreed with an employee of defendant's credit department to apply the $91,223, along with an additional payment, to a group of the debtor's older past-due accounts. Thus, the $91,223 wire transfer paid July 19 was never applied to the July 16 shipment but rather was applied to satisfy older invoices dated March 9, 12, 19, and 26, 1982.

The parties presented extensive proof regarding the question of the debtor's solvency during the 90-day period preceding commencement of the reorganization. According to the acting comptroller Haley, the debtor's internal financial statements indicated a positive net worth of $559,646.05 on July 31, 1982. Similarly, the internal statements showed a positive net worth of $373,761.76 on August 31, 1982. However, the internal statements showed a negative net worth of $1,561,499.99 on September 30, 1982. Prior to preparation of the July internal statement, Hazen, in accordance with a management consensus, made certain accounting adjustments regarding accounts receivables and contract completion costs. Hazen testified that he made all adjustments to these items which management considered reasonable at that time. According to Haley, a significant factor contributing to the dramatic plunge in net worth in September was the removal from the corporation's assets of an income tax benefit receivable. Prior to this time, the

debtor had included this receivable as an asset because of its assumption that the debtor's parent corporation would pass along to the debtor the income tax benefit related to the debtor's current period losses. However, Haley deleted the asset from his September figures after learning that the parent company would not confirm that the benefit would be passed on to the debtor.

The questionability of this particular asset came to Haley's attention as a result of a review of the debtor's balance sheet performed by A.M. Pullen and Company, an accounting firm engaged in August to examine the debtor's financial statements as of July 31, 1982. Pullen and Company conducted its field work from mid-August to September 13, 1982. Pullen and Company then issued its review indicating its conclusion that a balance sheet showing a net worth of $559,647 as of July 31, 1982, was fairly presented on a going concern basis with, however, significant qualifications as to certain assets.

For example, in its note regarding the "$1,186,069 related to the tax benefit of current period losses," Pullen and Company observed that "the realization of this receivable is not reasonably assured" and that "such a gain contingency may not be realized by the Company." As to its basis of presentation, Pullen and Company noted that the financial statement was prepared on a "going concern" basis, contemplating realization of assets and satisfaction of liabilities in the normal course of business, but further observed:

Because of the significance of the operating loss for the period ended July 31, 1982, the slow down of plant activity and lack of potential new contracts due to economic conditions, the inability to obtain necessary working capital from any source, and the Company's current liabilities exceeded its current assets by $137,907, there is an indication that the Company may be unable to continue in existence. The financial statements do not include any adjustments relating to the recoverability and classification of re-

corded asset amounts or the amounts and classification of liabilities that might be necessary should the Company be unable to continue in existence. The Company's continued existence is dependent upon its ability to generate sufficient cash flow to meet its obligations on a timely basis, to comply with the terms and covenants of its financing agreements, to obtain additional financing or refinancing as may be required, and ultimately to obtain profitable operations.

Specifically regarding the tax benefit receivable, Ed Souther of Pullen and Company indicated that the debtor's management contended that the receivable should be included as an asset because it had been consistently included in previous years. However, the parent corporation refused to confirm that the benefit would be passed on to the debtor. Souther indicated that whether the debtor's loss would be included in a consolidated tax return with the parent corporation, and the tax effect of the loss if so included, could not be reasonably predicted. Souther classified the asset as one that was neither remote nor probable, but rather a possibility. ·

After commencement of this action, in June 1983, defendant engaged the accounting firm of Price Waterhouse to review and analyze debtor's financial condition as of July, August, and September of 1982. Michael E. Collins, a certified public accountant with the firm, presented a schedule of adjustments to the July 31, 1982, net equity. Taking the financial statement reported on by Pullen and Company as a point of departure, Collins made adjustments to various items on a "liquidation" rather than "going concern" basis. Some adjustments somewhat increased the net equity. However, the overall result of the Price Waterhouse adjustments was a negative net equity of $2,282,000 as of July 31, 1982.

Four major adjustments were the primary factors in this dramatic alteration. First, Price Waterhouse wrote off the $1,186,000 income tax benefit receivable.

Secondly, they decreased the net equity by increasing by $93,000 the reserve for doubtful accounts receivable. Thirdly, they decreased the net equity by $1,448,000 in adjustments to accrued costs on contracts and construction in progress. Finally, they wrote down the value of equipment and property by $321,000.

Collins characterized the income tax benefit receivable as "highly questionable." According to Collins, in previous years this item had received different treatment. He indicated the item was much smaller in earlier years and had simply been reflected on financial statements as an income tax receivable or refund and not as a receivable from the parent company. This was changed as the amount grew larger in subsequent years. In support of Price Waterhouse's conclusion that the asset should be removed, Collins pointed out that the debtor's management had removed the item in September 1982, a number of months before Price Waterhouse began its work.

Regarding the adjusted costs of contracts in progress, Collins cited a history of a "poor estimating ability"[2] on debtor's part in this area. Although the July 1982 internal financial statements reflected that five major contracts were essentially complete, subsequent events demonstrated that significant additional costs were required to complete the contracts.

Based upon the various adjustments enumerated, Collins rendered his opinion that from July 19, 1982, until October 15, 1982, the debtor was "unequivocally, very insolvent."[3]

Collins acknowledged that the adjustments were made with the benefit of hindsight, but he stated that most of the determinations could be made with data available as of October 1982. However, he acknowledged that, particularly in regard to adjusting accounts receivable and costs to complete contracts, information extending as far as June 1983 was utilized. Price Waterhouse employed "liquidation" valua-

---

**2.** Transcript of Testimony, p. 36 (November 1, 1983).

**3.** Transcript of Testimony, p. 37 (November 1, 1983).

tion because the debtor was in bankruptcy and because the Pullen and Company review indicated that the potential for bankruptcy clearly existed as of July 31, 1982. Collins expressed his opinion that due to the magnitude of the debtor's insolvency, as reflected in the adjusted net equity figure, the debtor's insolvency could conceivably extend back to June 30, May 31, or possibly April 30 of 1982.

Carl Hazen, the debtor's president, indicated he believed the Pullen and Company review to be correct when he initially received it, but he acknowledged that subsequent events demonstrated both a legal question as to the availability of the income tax benefit receivable and an unanticipated degree of deterioration in the contracts in progress.

Since Pullen and Company concluded its field work on September 13, 1983, it obviously did not utilize in its review information becoming available only after that date. However, Ed Souther indicated that, had the field work continued until a later date, he would have considered such subsequently available information.

## II

The debtor in possession contends that it was insolvent during the entire 90-day period preceding commencement of this case and that all of the transfers comprising the disputed $213,541.45 satisfy the criteria of an avoidable preference under 11 U.S.C.A. § 547(b) (1979). Specifically regarding the $91,223 wire transfer, the debtor in possession maintains that this payment was for antecedent debts and was not a contemporaneous exchange for new value as envisioned by 11 U.S.C.A. § 547(c)(1) (1979). Similarly, the debtor in possession asserts that since the shipment of resin on July 16, 1982, occurred before the payment on July 19, 1982, the defendant may not claim the value of the July 16 shipment under 11 U.S.C.A. § 547(c)(4) (1979) as a set-off for

new, unsecured credit extended to the debtor after a preferential payment.

The defendant contends that the debtor was not insolvent in July and August, 1982. Thus, the defendant argues that only those transfers made in September 1983 were avoidable preferences.[4] Defendant also maintains that the $91,223 wire transfer and the July 16 shipment were a contemporaneous exchange for new value within the purview of 11 U.S.C.A. § 547(c)(1) (1979). Additionally, defendant asserts the applicability of 11 U.S.C.A. § 547(c)(4) (1979).

■ The debtor in possession has carried its burden of proof as to the question of the debtor's insolvency at the time of the disputed transfers.

The parties devoted considerable attention to whether the income tax benefit of current period losses was properly removed as a receivable due from the parent corporation in evaluating the debtor's solvency during July and August 1982. However, it is unnecessary to decide whether the debtor was entitled to receive this benefit from its parent corporation or whether the asset was properly removed from the balance sheet. Even disregarding the questions pertaining to this asset, other proper adjustments clearly demonstrate the debtor's insolvency during the relevant period.

The Price Waterhouse adjustment to the July 31, 1982, net equity relative to accrued costs on contracts and construction in progress was by itself sufficient to demonstrate a deficit in net worth. Decreasing the net equity by the $1,448,000 outlined in the schedule of adjustments would alone result in a deficit of $629,000, even after taking into account the other adjustments on the schedule increasing the net equity and disregarding any other adjustments decreasing the net equity. Naturally, if the other adjustments pertaining to increasing doubtful accounts receivable and writing down the value of property and equipment are considered, the deficit is even larger.

---

4. Except in regard to the $91,223, the defendant acknowledges that the disputed amounts were transferred in payment of antecedent debts.

Thus, as to that portion of the disputed $213,-541.45, other than the $91,223, the sole issue is debtor's solvency.

Michael Collins of Price Waterhouse testified essentially that the debtor's internal records regarding contracts in progress were in error. According to Collins, internal audits of the debtor by the parent corporation revealed "a poor estimating ability in that area."[5] Further, July 1982 internal financial statements erroneously reflected a number of contracts as completed when, in fact, significant amounts of additional costs were subsequently incurred in completing the contracts.[6]

Questioned as to his opinion regarding the correctness of the July 31, 1982, financial statements reviewed by Pullen and Company, Carl Hazen, the debtor's president, acknowledged that the debtor's contracts had "deteriorated even further than we had anticipated at that time."[7]

Thus, this particular liability was inaccurately reflected on the financial statements relied upon by the defendant to establish the debtor's solvency.

Defendant contends that, since insolvency must be assessed under 11 U.S.C.A. § 547(b) (1979) as of the time of the transfers, the court may only consider the costs of completion of contracts as they appeared and were reflected on the debtor's records at the time of the transfers. Defendant objects to the use of hindsight in reappraising the correctness of these figures. However, merely because the court must assess insolvency as of the date of the transfer does not mean that the court is bound to accept an erroneous valuation appearing on the debtor's records at that time.

In *Foley v. Briden (In re Arrowhead Gardens)*, 32 B.R. 296 (Bkrtcy.D.Mass. 1983), the court refused to accept a balance sheet as an accurate portrayal of the debtor's financial condition. Pointing to several "erroneous asset valuations," 32 B.R. at 300, the court revised the balance sheet to show insolvency, reducing accounts receivable by an amount subsequently proving to be uncollectible, correcting overstated inventory, and eliminating an improperly included asset.

Similarly, in *Buchanan State Bank v. De Groot*, 39 F.2d 397 (6th Cir.1930), the court considered, in assessing insolvency, evidence that the value of a store listed on the debtor's schedule was overstated. The court took into account the existence of a mortgage against the property omitted from the schedule, the failure to consider a depreciation factor, and testimony that the going concern value of the business was less than that reflected on the schedule.

Clearly, in evaluating assets such as accounts receivable, the courts assess the validity and collectibility of the accounts as of the critical date, yet may rely on hindsight gained from the success or failure of subsequent efforts to collect the accounts. 2 *Collier on Bankruptcy* ¶ 101.26 at 101–58 (15th ed. 1983); *Foley v. Briden*, 32 B.R. at 299–300.

Similarly, in this context the court may properly consider the existence of subsequently apparent estimating errors which caused the accrued costs on contracts and construction in progress to be inaccurately reflected at the time in question.

Certainly, the insolvency of the debtor must be determined as of the dates of the transfers and, in making that determination, both the worth of assets and the extent of liabilities must be evaluated at what they were at the time of the transfers and not at what they turned out to be after the intervention of bankruptcy. *Mutual Savings & Loan Association v. McCants*, 183 F.2d 423, 425 (4th Cir.1950). However, the court may consider information originating subsequent to the transfer date if it tends to shed light on a fair and accurate assessment of the asset or liability as of the

---

5. Transcript of Testimony, p. 36 (November 1, 1983).

6. In arriving at the $1,448,000 adjustment, Price Waterhouse concentrated on only five major contracts with significant changes in estimated profitability in excess of $100,000. Even then,

they did not adjust in all cases the full amount of the additional costs revealed, choosing to adjust $1,448,000 out of a possible $1,956,000.

7. Transcript of Testimony, p. 91 (November 17, 1983).

pertinent date. For example, in *McClung-Logan Equipment Co. v. Friedman*, 195 F.2d 516 (4th Cir.1952), the court held it proper in determining the bankrupt's insolvency at the time of the transfer to consider an appraisal of real estate and equipment made after the date of the transfer. The court quoted the trial judge:

> Where, as is often the case in court proceedings, valuations have to be made as of an anterior date, the trier of facts must necessarily, in cases where property involved had no ascertained market value at the earlier time, receive and consider the best evidence available even though it originates subsequent in date to the precise point of time involved.

*Id.*

In *Hassan v. Middlesex County National Bank*, 333 F.2d 838 (1st Cir.1964), *cert. denied*, 379 U.S. 932, 85 S.Ct. 332, 13 L.Ed.2d 344 (1964), the court held that a trustee attempting to demonstrate the bankrupt's insolvency on a transfer date should have been permitted to introduce a later inventory, which was properly adjusted by working backward to the transfer date, to establish the status of the inventory on the critical date. The court observed:

> Insolvency is not always susceptible of direct proof and frequently must be determined by the proof of other facts or factors from which the ultimate fact of insolvency on the transfer dates must be inferred or presumed. 1 Collier on Bankruptcy 123 (14th ed. 1962). The method sought to be used by appellant is not novel and has been utilized often in bankruptcy proceedings. [Citations omitted] … When such a method is sought to be invoked it is essential that the trustee be able to show the absence of any substantial or radical changes in the assets or liabilities of the bankrupt between the retrojection dates.

*Hassan v. Middlesex County National Bank*, 333 F.2d at 840–841.

In *Inter-State National Bank of Kansas City v. Luther*, 221 F.2d 382 (10th Cir. 1955), *appeal dismissed*, 350 U.S. 944, 76 S.Ct. 297, 100 L.Ed. 823 (1956), the court ·considered as evidence of the bankrupt's insolvency on a date prior to the date of bankruptcy an audit of the bankrupt's books made after the date of bankruptcy and showing a continuous deterioration in the bankrupt's financial condition. The court said:

> [E]vidence of insolvency on dates before and after preference dates is competent evidence of insolvency on those dates, especially when considered with evidence of continued decline toward bankruptcy.

*Inter-State National Bank of Kansas City v. Luther*, 221 F.2d at 391.

In the instant case the Price Waterhouse adjustments to the accrued costs on contracts and construction in progress were made to correct errors on the debtor's internal records showing certain contracts as completed which were, in fact, not completed. The picture presented by the debtor's internal records was not, then, an accurate portrayal of this item as of the dates of the transfers. Rather than reflecting any sub·sequent substantial or radical changes in the liability, the adjustments actually serve only to correct errors existing at the time of the transfers and to realistically portray the correct status of the liability. The court is persuaded that this adjustment amply demonstrates the debtor's insolvency during the 90-day period preceding the filing of its reorganization petition.

■ The $91,223 wire transfer may not be excepted from treatment as a preference under 11 U.S.C.A. § 547(c)(1) (1979).[8] Under § 547(c)(1) a transfer is not a preference if it is intended by the parties to be a

---

**8.** 11 U.S.C.A. § 547(c)(1) (1979) provides:
  (c) The trustee may not avoid under this section a transfer—
    (1) to the extent that such transfer was—
    (A) intended by the debtor and the creditor to or for whose benefit such transfer was

made to be a contemporaneous exchange for new value given to the debtor; and
    (B) in fact a substantially contemporaneous exchange.

contemporaneous exchange for new value given to the debtor and if it is, in fact, a substantially contemporaneous exchange. This section codifies the rule of *Dean v. Davis*, 242 U.S. 438, 37 S.Ct. 130, 61 L.Ed. 419 (1917) and *National City Bank of New York v. Hotchkiss*, 231 U.S. 50, 34 S.Ct. 20, 58 L.Ed. 115 (1913), holding that it is the intention of the parties at the outset that determines whether the transaction was contemporaneous. *Aetna Business Credit v. Hart Ski Mfg. Co. (In re Hart Ski Mfg. Co.)*, 7 B.R. 465, 468 (Bkrtcy.D.Minn.1980); 4 *Collier on Bankruptcy* ¶ 547.37 at 547-118 (15th ed. 1983).

Both Haley, the debtor's acting comptroller, and Donald Stoll, the defendant's general credit manager, testified that by June 1982, the parties had reached an understanding as to the application of payments by the debtor to past-due accounts. Under the arrangement, the defendant would make a shipment and the debtor would then make a payment of approximately twice the cost of the shipment. The payment was then applied against older, past-due invoices. The purpose of this procedure was to insure current shipment of material to the debtor while reducing the defendant's exposure on past-due accounts. In fact, Stoll acknowledged that if the defendant had feared any possibility of bankruptcy by the debtor the defendant would not have engaged in such a procedure but would have insisted on applying the payments contemporaneously to current shipments.

Given this arrangement, it is clear that the parties never intended the July 19 $91,-223 wire transfer as a contemporaneous exchange for the July 16 shipment of Amberlite. The defendant had refused to make further shipments because of the serious extent of the debtor's past-due indebtedness. The shipment was made in exchange for an agreement to furnish the wire transfer equivalent in value to the shipment. However, the payment was never applied to the July 16 shipment. After

crediting the payment generally to the debtor's account, the defendant, in negotiation with the debtor, applied the entire amount to reduce the amount owed on the debtor's older accounts. This course of action clearly establishes that the parties intended only that the defendant would continue to extend credit by making the shipment if the debtor continued to pay on its debts.

In *McClendon v. Cal-Wood Door (In re Wadsworth Building Components)*, 711 F.2d 122 (9th Cir.1983), the court confronted a situation very closely on point. There the defendant made a shipment upon the debtor's assurance that the debtor would make good a dishonored check given for a prior shipment. The debtor made good the check and the defendant made a shipment approximately equal in value to the amount of the check. Holding the payment to be a preference, the court said:

> The critical inquiry in determining whether there has been a contemporaneous exchange for new value is whether the parties intended such an exchange. 11 U.S.C. § 547(c)(1) (Supp. IV 1978); 4 *Collier on Bankruptcy*, para. 547.–37[2] (15th ed. 1979). Here, the stipulation of facts states that the debtor was required to pay *past* debts before it would receive further credit. Value was given only for a future promise to pay. The check, therefore, is not exempted from treatment as a preference by § (c)(1).

*McClendon v. Cal-Wood Door*, 711 F.2d at 124.

Similarly, the July 16 shipment in the instant case merely represented the extension of additional credit upon the condition that the debtor would pay the past debts. The July 19 $91,223 wire transfer may not be excepted from treatment as a preference under 11 U.S.C.A. § 547(c)(1) (1979).

▮ Nor may the payment be excepted from treatment as a preference under 11 U.S.C.A. § 547(c)(4) (1979).[9] This section

---

9. 11 U.S.C.A. § 547(c)(4) (1979) provides:

(c) The trustee may not avoid under this section a transfer ...

provides that a creditor is entitled to offset against a preferential transfer any further unsecured credit extended to the debtor after the preferential transfer. The provision is appropriately termed the "subsequent advance rule" and may only be brought into play if the creditor to whom an otherwise avoidable preferential payment has been made provides additional value to the debtor *after* the preferential transfer. *Waldschmidt v. Ranier (In re Fulghum Construction Corp.)*, 706 F.2d 171 (6th Cir.1983), *cert. denied*, —— U.S. ——, 104 S.Ct. 343, 78 L.Ed.2d 310 (1983).

■ The debtor's president, Hazen, could not recall whether he instructed his accounting department to wire the funds on July 16 or July 19. He believed, however, that under his general practice he would have ordered the department to make the transfer once he had been advised by the defendant that the shipment had been made. The debit ticket for the transfer, however, bears a stamp indicating it was paid by the ordering bank on July 19. There was no indication that the defendant received the funds or a report designating the occurrence of the transaction until July 19.

Under these circumstances the transfer must be deemed to have occurred on July 19, the earliest date for which there is clear proof that the transfer was either ordered or paid by the debtor or received by the defendant. Even acknowledging a split of authority between those courts holding that a transfer by check occurs when a check is honored, *Nicholson v. First Investment Co.*, 705 F.2d 410 (11th Cir.1983); *In re Duffy*, 3 B.R. 263 (Bkrtcy.S.D.N.Y. 1980), those holding that a transfer occurs when the check is received, *Gold Coast Seed Co. v. Spokane Seed Co. (In re Gold Coast Seed Co.)*, 30 B.R. 551 (Bkrtcy.App. 9th Cir.1983), and those holding that a transfer occurs when the check is mailed, *Eisenberg v. J.L. International, Ltd. (In re Sider Ventures & Services Corp.)*, 33 B.R. 708, 11 B.C.D. 524 (Bkrtcy.S.D.N.Y. 1983), it is clear that no transfer was accomplished simply by the debtor's president making a request to his accounting department to send the wire transfer. There is simply no proof that the debtor ordered the wire transfer before July 19.

The shipment of Amberlite was made on July 16 *before* the wire transfer. Clearly, this cannot be said to be the giving of new value, or the extension of new, unsecured credit to the debtor subsequent to the preferential wire transfer. Thus, the defendant is not entitled under 11 U.S.C.A. § 547(c)(4) (1979) to offset the value of the July 16 shipment against the preferential transfer.

Under the applicable law, the $213,541.45 transferred to defendant during the 90 days preceding the commencement of the debtor's reorganization were preferential transfers which the debtor in possession is entitled to avoid.

In accordance with Bankruptcy Rule 7052, this Memorandum constitutes findings of fact and conclusions of law.

---

(4) to or for the benefit of a creditor, to the extent that, after such transfer, such creditor gave new value to or for the benefit of the debtor—

(A) not secured by an otherwise unavoidable security interest; and

(B) on account of which new value the debtor did not make an otherwise unavoidable transfer to or for the benefit of such creditor.