805 F.2d 719
 Bankr. L. Rep. P 71,497
In the Matter of John B. PRESCOTT and Janet L. Prescott, Debtors.
Appeals of MARINE BANK DANE COUNTY, Gateway Foods, Inc. &
Jerry J. Armstrong, Trustee.
 Nos. 85-3162, 85-3177 and 85-3203.
 United States Court of Appeals,
Seventh Circuit.
 Argued June 10, 1986.
Decided Nov. 4, 1986.
 
 Patricia M. Gibeault, Brynelson, Herrick, Bucarda & Dorschel, Madison, Wis., for Marine Bank Dane County.
 Michael J. Collard, Minahan & Peterson, S.C., Milwaukee, Wis., for Gateway Foods.
 Deniz N. Gursoy, Murphy & Desmond, S.C., Madison, Wis., for trustee.
 Before WOOD, CUDAHY and FLAUM, Circuit Judges.
 CUDAHY, Circuit Judge.
 
 
 1
 John and Janet Prescott (the "debtors") funded their purchase of a Wisconsin grocery store with a loan from appellant Marine Bank Dane County that was secured, inter alia, by the store's inventory and accounts receivable. Appellant Gateway Foods, Inc. held a junior interest in this security. The debtors filed for bankruptcy in the United States Bankruptcy Court for the Western District of Wisconsin. The bankruptcy court found that during the preference period preceding this filing, Marine had received preferential transfers of $40,733.33, resulting from its taking possession of the Prescotts' certificate of deposit, receiving payment for overdrafts in their bank accounts and offsetting debtors' positive balance accounts, 51 B.R. 751. The bankruptcy court found these transfers resulted in an indirect benefit to Gateway of $59,643.71. The United States District Court for the Western District of Wisconsin affirmed the bankruptcy court's findings as to Marine but in part reversed the findings as to Gateway. The district court held that an indirect beneficiary could not be found to have benefited from another creditor's setoff and that the bankruptcy court had erred in not considering Gateway's extension of new value in computing the size of its preference. We reverse the judgment of the district court to the extent that its findings depart from the judgment of the bankruptcy court, thus in effect reinstating the bankruptcy court findings.
 
 
 2
 John Prescott became manager of a Gateway Foods Store in Monona, Wisconsin, in November 1980. One year later, he purchased the Monona store with a $396,000 demand note from Gateway, secured by an interest in all the store's inventory and equipment. Five days later, Prescott purchased a second Gateway store in Stoughton, Wisconsin. Gateway was the sublessor of the Stoughton store and was granted certain security interests in that store's inventory and equipment to secure lease payments and payment for other goods and services it provided to Prescott.
 
 
 3
 In December 1982, John Prescott purchased a third Gateway store on East Washington Avenue in Madison, Wisconsin (the "East Washington store"). Gateway referred Prescott to Marine Bank, which loaned him $125,000 for the purchase. Marine's loan was secured by a perfected senior security interest in the East Washington store's inventory, equipment and accounts receivable. As additional security for Marine's loan, Prescott agreed to deliver a $45,000 certificate of deposit within 60 days. Marine took possession of the certificate on March 17, 1983. Marine was also secured by any credit balances in Prescott's bank accounts at Marine and by all property secured by future security agreements between Marine and Prescott. Prescott maintained three accounts with Marine--a business savings account and two separate checking accounts for the Monona and East Washington stores. Gateway agreed to guarantee one half of the declining balance of Prescott's $125,000 note to Marine.
 
 
 4
 As with the Monona store, Gateway was the sublessor for the East Washington store and acted as its primary supplier. As with the Stoughton store, Gateway received a second lien on the store's inventory and equipment. Gateway also performed many other services for Prescott, including providing advance funds for payroll expenses and taxes and providing accounting services. Between March 17, and March 31, 1983, Gateway made advances to Prescott and extended credit totaling $148,474,48. Gateway was reimbursed only $51,990 for these advances. After many of Prescott's checks to Gateway were returned for insufficient funds and after Gateway determined that its security interest in Prescott's stores had decreased, Gateway took over the three Prescott stores on March 31, 1983.
 
 
 5
 Gateway notified Marine of its actions on April 4, 1983. Thereafter, Marine deemed itself undersecured on its note from Prescott. Marine froze Prescott's three accounts, containing a total positive balance of $18,353.59 and offset this amount against Prescott's indebtedness on his note, which then had a balance of $121,920.49. On June 3, 1983, Marine cashed in the certificate of deposit, receiving proceeds of $34,290.12, and applied this against Prescott's indebtedness.
 
 
 6
 Prescott filed for relief under Chapter 7 of the Bankruptcy Code, 11 U.S.C. Sec. 701 et seq., on June 14, 1983 in the United States Bankruptcy Court for the Western District of Wisconsin. On November 23, 1983, the trustee of the debtors' estate, Jerry J. Armstrong, brought an adversary proceeding to recover alleged preferential transfers to Marine and indirect transfers to Gateway.
 
 
 7
 The bankruptcy court determined that on March 16, 1983, the date the preference period began, Marine was owed $172,467.33. This represented the balance of $121,919.73 on the loan and bank account overdrafts of $50,547.60.[1] The bankruptcy court found that after the preference period began, Marine received bank deposits that eliminated the overdraft and left a positive balance of $18,353.59. That positive balance was offset on April 4. In June, Marine cashed in the certificate of deposit, receiving proceeds of $34,290.12. The bankruptcy court ruled that the setoff and the cashing of the certificate were preferential transfers to the extent that Marine had been undersecured on March 16. The court determined that as of March 16 Marine was undersecured by $40,733.33--the difference between $172,467.33 owed and the value of Marine's collateral on that date, which the court found to be $131,734. This collateral consisted of inventory and accounts receivable in the East Washington store valued at $130,000 and a positive savings account balance on that date of $1,734.
 
 
 8
 Gateway as junior lienholder benefited from the improvement in Marine's position.[2] The bankruptcy court found that as Marine's debt secured by the East Washington store inventory decreased, Gateway's security was thereby increased dollar for dollar. This, the court determined, resulted in an indirect preferential transfer to Gateway to the extent the amount transferred to Marine reduced the fund for payment to other creditors with unsecured claims. The court found Gateway to have been indirectly preferred in the amount of $59,643.71--the amount by which Marine's security exceeded its claim.[3]
 
 
 9
 The bankruptcy court entered judgment against Marine and Gateway jointly in the amount of $40,733.33 and against Gateway individually in the amount of $18,910.93.
 
 
 10
 Both Marine and Gateway appealed the bankruptcy court's decision to the district court. On that appeal, Marine raised three issues. First, it contended that the bankruptcy court abused its discretion in allowing and considering testimony concerning the overdrafts on Prescott's bank accounts during the preference period. Second, Marine argued that the bankruptcy court erred in denying Marine's motion to dismiss because the trustee never proved that Marine received a preference as defined in 11 U.S.C. Sec. 547(b). No preference was shown, Marine argued, because the trustee never established the value of Marine's collateral on March 16, 1983, and thus never showed Marine to be undersecured. Finally, Marine contended that, assuming the value of collateral was established, the bankruptcy court erred in computing the amount of Marine's preference because it failed to consider proceeds of collateral in estimating the value of the March 16 collateral and did not take into account exchanges for new value made during the preference period as is required by 11 U.S.C. Sec. 547(c)(1) and (4). The district court affirmed the bankruptcy court's findings on these points.
 
 
 11
 Gateway also raised three issues on appeal before the district court. First, it claimed it was not liable for Marine's setoff of Prescott's accounts or for Prescott's payments of overdrafts existing on March 16, 1983. Second, Gateway argued it was not liable for Prescott's transfer of the certificate of deposit. Third, Gateway raised an argument similar to Marine's, arguing that because the trustee never established the value of Marine's collateral and thus Marine's undersecurity, he also did not establish that Gateway received an indirect preference; the bankruptcy court therefore erred in finding Gateway liable under 11 U.S.C. Sec. 547(b).
 
 
 12
 The district court agreed that Gateway was not responsible for Marine's setoff. The court read 11 U.S.C. Sec. 553 to prohibit a trustee from recovering a setoff from an indirect beneficiary. The court also agreed with Gateway that new value had been transferred after March 17, 1983 that offset Gateway's liability for the certificate of deposit. While reversing the bankruptcy court on these points, the district court agreed that Gateway was indirectly benefited by Prescott's repayment of the overdrafts and that Marine's undersecurity was sufficiently established to find Gateway to have received an indirect preference of $50,546.84. The district court found Marine and Gateway jointly liable to the trustee for $31,636.46, Marine individually liable for $9,096.83 and Gateway individually liable for $18,910.38.
 
 
 13
 In its appeal before this court, Marine reiterates its arguments made before the district court that the bankruptcy court should not have considered evidence of overdrafts, that the court erred in finding that the value of Marine's collateral had been established and that it failed to consider new value in computing the amount of Marine's preference. Marine additionally argues that its setoff of Prescott's positive balance bank accounts should not have been considered a transfer under 11 U.S.C. Sec. 547. In its appeal, Gateway also repeats its arguments that the trustee never proved an indirect preference and that the bankruptcy court wrongly regarded Prescott's repayment of overdrafts as a transfer under 11 U.S.C. Sec. 547. The trustee cross-appeals the district court's decision. He argues that Gateway should have been held indirectly responsible for Marine's setoff of the positive balance bank accounts and for the proceeds of the certificate of deposit.
 
 I. Evidence of Overdrafts
 
 14
 Marine argues that the bankruptcy court improperly considered evidence of the overdrafts in Prescott's bank accounts in determining whether Marine received a preference. Marine notes that the trustee's original complaint did not allege that the overdrafts increased Prescott's debt to Marine, and because the trustee never formally amended his complaint to include this argument, Marine contends it never received fair notice that the overdrafts were in issue, as is required by Federal Rule of Civil Procedure 8(a), applicable in bankruptcy proceedings through Bankruptcy Rule 7008(a). While Marine admits the trustee raised the issue of the overdrafts in his response to Marine's motion for summary judgment, Marine suggests this occurred after most time for discovery and trial preparation had passed. As a result, Marine says that because it did not believe the overdraft issue was before the court it did not include a history of Prescott's accounts in its exhibits or perform discovery regarding Prescott's practice of regularly overdrafting his accounts.
 
 
 15
 We agree with the district court that the bankruptcy judge acted within his discretion in admitting evidence of Prescott's overdrafts and ruling on whether the overdrafts constituted an additional preference to Marine. That the original complaint did not raise the issue does not prevent the bankruptcy court from ruling on the matter. As this circuit recently said, "the Federal Rules of Civil Procedure create [a system] in which the complaint does not fix the plaintiff's rights but may be amended at any time to conform to the evidence." Duckworth v. Franzen, 780 F.2d 645, 649 (7th Cir.1985) cert. denied, --- U.S. ----, 107 S.Ct. 71, 93 L.Ed.2d 28 (1986). The procedure for amending pleadings to conform to the evidence is established by Federal Rule of Civil Procedure 15(b), applicable in bankruptcy courts by Bankruptcy Rule 7015:
 
 
 16
 When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings. Such amendment of the pleadings as may be necessary to cause them to conform to the evidence and to raise these issues may be made upon motion of any party at any time, even after judgment; but failure so to amend does not affect the result of the trial of these issues....
 
 
 17
 Fed.R.Civ.P. 15(b). The intent of rule 15(b) is "to provide the maximum opportunity for each claim to be decided on its merits rather than on procedural niceties." Hardin v. Manitowoc-Forsythe Corp., 691 F.2d 449, 456 (10th Cir.1982).
 
 
 18
 The key factor in determining whether the pleadings have been amended is whether the issue has been tried with the express or implied consent of the parties. The test for such consent is "whether the opposing party had a fair opportunity to defend and whether he could have presented additional evidence had he known sooner the substance of the amendment." Hardin, 691 F.2d at 456. One sign of implied consent is that issues not raised by the pleadings are presented and argued without proper objection by opposing counsel. See Apple Barrel Productions, Inc. v. Beard, 730 F.2d 384, 389 (5th Cir.1984); Leatherman v. Gateway Transportation Co., 331 F.2d 241, 246 (7th Cir.1964); Gallegos v. Stokes, 593 F.2d 372 (10th Cir.1979). To demonstrate lack of consent, the objection should be on the ground that the contested matter is "not within the issues made by the pleadings." Fed.R.Civ.P. 15(b); see United States Fidelity and Guaranty Co. v. United States, 389 F.2d 697, 698-99 (10th Cir.1968) ("[w]here no objection is made to evidence on the ground it is outside the issues of the case, the issue raised is nevertheless before the trial court for determination, and the pleadings should be regarded as amended in order to conform to the proof") (citations omitted). Implied consent may also be found if the opposing party itself presents evidence on the matter. See Hardin, 691 F.2d at 457; 6 C. Wright and A. Miller, Federal Practice and Procedure Sec. 1493 at 463-65.
 
 
 19
 Here, Marine knew prior to trial that the overdraft issue would be raised. On August 13, 1984, it received the trustee's Memorandum in Opposition to Motion for Summary Judgment which incorporated claims that the overdrafts constituted additional indebtedness to Prescott. On August 31, 1984, Marine received the trustee's Proposed Findings of Fact and Conclusions of Law which also indicated that the overdrafts would be addressed at trial. At the trial, Marine objected to certain evidence concerning the overdrafts on grounds of hearsay and relevancy but never objected that the evidence was outside the pleadings. Marine never made a showing of prejudice regarding the evidence or argued an inability to defend the issue. It never sought a continuance for additional time to meet new evidence. Under these circumstances we cannot say that the bankruptcy court exceeded its substantial discretion in considering the evidence. See 6 Wright & Miller Sec. 1495 at 480-81.
 
 II. Valuation of Marine's Security
 
 20
 Before the bankruptcy court, the trustee alleged that Marine had received an avoidable preference under 11 U.S.C. Sec. 547(b). That section provides:
 
 
 21
 (b) Except as provided in subsection (c) of this section, the trustee may avoid any transfer of an interest of the debtor in property--
 
 
 22
 (1) to or for the benefit of a creditor;
 
 
 23
 (2) for or on account of an antecedent debt owed by the debtor before such transfer was made;
 
 
 24
 (3) made while the debtor was insolvent;
 
 
 25
 (4) made--
 
 
 26
 (A) on or within 90 days before the date of the filing of the petition; or
 
 
 27
 (B) between ninety days and one year before the date of the filing of the petition if such creditor at the time of such transfer was an insider;
 
 
 28
 (5) that enables such creditor to receive more than such creditor would receive if(A) the case were a case under chapter 7 of this title;
 
 
 29
 (B) the transfer had not been made; and
 
 
 30
 (C) such creditor received payment of such debt to the extent provided by the provisions of this title.
 
 
 31
 The trustee has the burden of proving the first, second, fourth and fifth elements of a preference by a preponderance of the evidence. See In re the Music House, Inc., 11 B.R. 139 (Bankr.D.Vt.1980); In re Hogg, 35 B.R. 292 (Bankr.S.D.1983). No one disputes that the first four elements have been proven. The parties do disagree on whether the trustee has established the fifth element--that the transfers enabled Marine to receive more than it would have had they not been made.
 
 
 32
 In order to meet this burden, the trustee generally must establish that the preferred party's claim is not fully secured. The payment of a secured claim ordinarily does not allow a creditor to receive more than it would receive in a Chapter 7 distribution. See In re Santoro Excavating, Inc., 32 B.R. 947 (Bankr. S.D.N.Y.1983); In re Hale, 15 B.R. 565, 567 (Bankr.S.D.Ohio 1981). By contrast, an unsecured claim is by definition one held by a party in the class of general creditors; it is subject to rules of priority and entitled to distribution only pro rata with other general claims. A payment to a creditor with an unsecured claim, therefore, may well favor that party over other general claimholders.
 
 
 33
 In the instant case, to meet his burden, the trustee must establish that the value of Marine's collateral on March 16, 1983--the date before the first alleged preferential transfer took place--was less than the amount owed by Prescott to Marine on that date. Marine contends that the trustee did not meet this burden before the bankruptcy court. It states that no evidence was presented to establish the value of inventory at the East Washington store on March 16: John Prescott was asked at trial to estimate the value of the store's inventory on that date, but he never answered the question. Therefore, Marine contends, the bankruptcy court's finding is clearly erroneous. The court's assessment of the value of the collateral is additionally in error, Marine argues, because it never took into account the value on that date of other elements of the collateral, such as accounts receivable or proceeds from inventory.
 
 
 34
 The bankruptcy court's findings on this matter are subject to the clearly erroneous standard. See Ginsu Products, Inc. v. Dart Industries, Inc., 786 F.2d 260 (7th Cir.1986). A finding is clearly erroneous when "although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." United States v. United States Gypsum Co., 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948)). Here, the bankruptcy court found that on March 16, 1983, Prescott was indebted to Marine in the following amounts:
 
 
 35
 note $121,920.49
overdrafts $ 50,546,84
 -----------
Total $172,467.33
 The court found that indebtedness secured by:
deposit accounts $ 1,734.00
inventory and accounts receivable $130,000.00
 -----------
Total $131,734.00
 
 
 36
 We agree with the district court that the support for the $130,000 figure is slender but that this is of necessity so. Prescott did not take inventory on March 16. When a debtor maintains control of certain collateral during part of the preference period, it is to be expected that precise figures for the exact date relevant to a court's valuation may be lacking. That is why no fixed formula exists for valuing collateral, and courts, in considering the facts, circumstances and competing interests of each case, have substantial leeway in arriving at a figure. Cf. Barash v. Public Finance Corp., 658 F.2d 504, 512 (7th Cir.1981); 3 Collier on Bankruptcy, p 506.04 at 506-24 ("[V]irtually no attempt is made [in the Bankruptcy Statute] to set forth the manner in, or basis ... upon which such valuation is to be conducted. These are left to judicial development."). If the value of a creditor's collateral had to be established with complete certainty before an avoidable preference could be found, section 547 would be of little effect, and its goal of securing equality of distribution among creditors, see In re J.E. Jennings, Inc., 46 B.R. 167 (Bankr.E.D.Pa.1985), would be unreachable.
 
 
 37
 Here, the bankruptcy court based its findings on several factors. Uncontroverted evidence at trial showed that the value, on March 31, 1983, of the East Washington store inventory was $130,000 at retail and $105,000 at wholesale. The joint application for relief from stay, filed by Marine and Gateway, and admitted into evidence at trial, alleged a wholesale value of $105,000 at the East Washington store as of June 14, 1983. Because the value of the inventory appears static for this period, it is not unreasonable to assume that it remained static for the two-week period in March. Prescott also testified at trial that the inventory of the other two stores remained static during this period. While these stores were in different communities and may have had a different pattern of inventory turnover, their static nature, in conjunction with the available evidence regarding the East Washington store, buttresses the trustee's position.
 
 
 38
 This evidence was sufficient to establish a prima facie case for the trustee. See In re Crump, 42 B.R. 636, 638 (Bankr.E.D.Mo.1984). At that point, the burden shifted to Marine to demonstrate that the trustee's figures were wrong. Apparently no rebuttal evidence was presented on inventory values or accounts receivable as of March 16. While Marine contends the court ignored evidence of more than $10,000 in proceeds from inventory in computing its valuation, the trustee argued that the evidence did not establish that these proceeds came from inventory available at the East Washington store on March 16. In any event, to the extent the bankruptcy court may have overlooked evidence of proceeds, this oversight tends to be mitigated by the fact that the court assessed the inventory at its retail value, rather than at the wholesale value which many bankruptcy courts have relied on in assessing creditors' interests in property. See In re Paige, 13 B.R. 713, 714 (S.D.Ohio 1981): Matter of Van Nort, 9 B.R. 218, 221 (Bankr.E.D.Mich.1981). Under these circumstances, we cannot say the bankruptcy court's findings were clearly erroneous.
 
 III. Marine's 547(c) Defenses
 
 39
 Marine next argues that, even assuming the bankruptcy court was correct in its valuation of Marine's collateral at the East Washington store, it failed to apply 11 U.S.C. Sec. 547(c)(1) and (4), which, Marine contends, limits its liability for the proceeds from the certificate of deposit. These provisions limit the trustee's avoiding power. Section 547(c)(1) provides:
 
 
 40
 (c) The trustee may not avoid under this section a transfer--
 
 
 41
 (1) to the extent that such transfer was
 
 
 42
 (A) intended by the debtor and the creditor to or for whose benefit such transfer was made to be a contemporaneous exchange for new value given to the debtor; and
 
 
 43
 (B) in fact a substantially contemporaneous exchange;
 
 
 44
 The theory behind 547(c)(1) and (4) is that, to the extent new value is offered, the preference is repaid to the estate. Marine contends its receipt of the certificate of deposit from Prescott on March 17, 1983 constituted a contemporaneous exchange for new value because at that time Prescott had overdrafts in excess of $40,000. The certificate, Marine argues, was given to pay for the overdrafts. Marine has the burden of proof on all 547(c) defenses. 11 U.S.C. Sec. 547(g). The district court determined that Marine did not meet this burden. We agree.
 
 
 45
 The critical inquiry in determining whether there has been a contemporaneous exchange for new value is whether the parties intended such an exchange. In re Wadsworth Building Components, 711 F.2d 122, 124 (9th Cir.1983); In re Chemical Separations Corp., 38 B.R. 890, 897 (Bankr.E.D.Tenn.1984); 4 Collier on Bankruptcy p 547.37 at 547-124 ("Whether the parties at the outset intended the exchange to be contemporaneous is determinative."). On December 15, 1982, Prescott pledged to deliver the certificate of deposit within 60 days as additional security for Marine's loan. When Prescott did not honor this commitment, Marine demanded and received the certificate of deposit. The evidence does not demonstrate that the parties intended this certificate of deposit to reduce what was owed on Prescott's overdrafts at that time, or that they departed from their original intention that the certificate of deposit would act as additional security for Marine's loan.
 
 
 46
 Marine also argues that the transfer of the certificate of deposit is at least partially "not avoidable" under section 547(c)(4). That section provides:
 
 
 47
 (c) The trustee may not avoid under this section a transfer--
 
 
 48
 ....
 
 
 49
 (4) to or for the benefit of a creditor, to the extent that, after such transfer, such creditor gave new value to or for the benefit of the debtor--
 
 
 50
 (A) not secured by an otherwise unavoidable security interest; and
 
 
 51
 (B) on account of which new value the debtor did not make an otherwise unavoidable transfer to or for the benefit of such creditor;
 
 
 52
 Marine contends that this "subsequent advance" rule should operate in its favor because of overdrafts incurred after the certificate of deposit transfer. Marine argues that after it received the certificate of deposit it continued to allow overdrafts in Prescott's accounts totaling $17,320.35, and it contends this amount should be deducted from what the court determined was its avoidable preference. The three requirements for a section 547(c)(4) defense were set forth in In re Saco Local Development Corp., 30 B.R. 859 (Bankr.D.Me.1983):
 
 
 53
 Section 547(c)(4) establishes a subsequent advance rule whereby a preferential transfer is insulated from a trustee's avoiding powers to the extent that a creditor extends new value, which is unsecured and remains unpaid, to a debtor after the preferential transfer.
 
 
 54
 Id. at 867 (emphasis in original). See also In re Formed Tubes, Inc., 46 B.R. 645, 646 (Bankr.E.D.Mich.1985); In re Bishop, 17 B.R. 180, 183 (Bankr.N.D.Ga.1982). Again, Marine has the burden of proof in establishing this defense. The district court determined that Marine failed to meet this burden because it never showed that any overdrafts went unpaid. By April 4, 1983, all of the Prescott accounts had positive balances.
 
 
 55
 IV. Deposits as They Affected Marine and Gateway
 
 
 56
 After March 16, Prescott made deposits into his Marine Bank accounts apparently sufficient to clear his overdrafts and leave a positive balance of $18,353.59 that Marine offset against Prescott's debt on the loan. The bankruptcy court considered these deposits in assessing the liability of Marine and Gateway. The district court agreed that these deposits resulted in preferential transfers to Marine but partially reversed the bankruptcy court's holdings as to Gateway. The district court concluded that under 11 U.S.C. Sec. 553 the deposits offset by Marine could not be considered to have benefited Gateway. The court agreed, however, that the money from Prescott that merely erased the negative balances was in payment for an antecedent debt and thus resulted in an indirect preference to Gateway. Marine and Gateway both contend before this court that no money deposited into Prescott's bank accounts after the preference period began should be considered in determining whether defendants received a preferential transfer. They argue that any deposits made were merely deposits in the regular course of business which do not constitute transfers under the Bankruptcy Code. The trustee cross-appeals the district court's holding that a party may not be indirectly preferred by a setoff. As all parties before this court raise questions regarding these deposits, we consider their arguments together.
 
 A. Repayment of Negative Balances
 
 57
 In order to establish that a creditor has received a preference, the trustee must establish that a transfer took place. Section 101(48) of the Bankruptcy Code defines "transfer" as follows:
 
 
 58
 "transfer" means every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with property or with an interest in property, including retention of title as a security interest....
 
 
 59
 11 U.S.C. Sec. 101(48). Deposits into bank accounts clearly can be transfers under the new Bankruptcy Code. As the Senate Report stated, "The definition of transfer is as broad as possible.... A deposit in a bank account or similar account is a transfer." S.Rep. No. 989. 95th Cong., 2d Sess. 27, reprinted in 1976 U.S. Code Cong. & Ad. News, 5787, 5813; Redmond v. Tuttle, 698 F.2d 414, 417 n. 8 (10th Cir.1983). However, under established caselaw, to the extent a deposit is made into an unrestricted checking account, in the regular course of business and withdrawable at the depositor's will, it is not avoidable by the trustee, Katz v. First National Bank of Glen Head, 568 F.2d 964, 969, (2d Cir.1977), cert. denied, 434 U.S. 1069, 98 S.Ct. 1250, 55 L.Ed.2d 771 (1978). This is because a deposit that is subject to withdrawal at the depositor's will does not deplete the bankruptcy estate. See 4 Collier on Bankruptcy p 547-16, at 547-59 ("The reasoning has been that the ordinary deposit results in substituting for currency, bank notes, checks, drafts and other bankable items as corresponding credit with the bank which may be checked against or withdrawn, and which provide the depositor with the medium of exchange in the transaction of business"); see also Citizens National Bank v. Lineburger, 45 F.2d 522 (4th Cir.1930).
 
 
 60
 The depositor does not have freedom to withdraw when the deposit is applied as payment for an antecedent debt. As the court said in Miller v. Wells Fargo Bank International Corp., 406 F.Supp. 452 (S.D.N.Y.1975):
 
 
 61
 If the deposit is accepted by the bank with an intent to apply it "on a pre-existing claim against the depositor rather than to hold [it] subject to the depositor's checks in ordinary course," ... the deposit is viewed legally as a transfer in payment of the debt. As such, it may be recovered by the trustee where the elements of a voidable preference are otherwise satisfied.
 
 
 62
 Id. at 467, aff'd, 540 F.2d 548 (2d Cir.1976); see also Katz, 568 F.2d at 970.
 
 
 63
 Here, to the extent the deposits compensated for overdrafts, they were payments on an obligation. Prescott had no right to keep using the money deposited. Nor does it matter that the bank was tolerant of Prescott's overdrafts. That the bank had earlier allowed Prescott to maintain overdrafts does not mean that Prescott had a right to continue the practice. Therefore the trustee could avoid deposits that were applied against Prescott's March 16 overdrafts insofar as they preferred Marine and indirectly preferred Gateway over other creditors.
 
 B. Setoff of Positive Balances
 
 64
 On April 4, 1983, Marine froze Prescott's bank accounts containing a positive balance of $18,353.59. Marine's security agreements provided that Prescott's bank accounts constituted additional security for the note. Therefore, the bankruptcy court interpreted Marine's action as a seizure of its collateral under Wisconsin Statute Sec. 409.305.[4] To the extent these funds helped to fully secure Marine, the bankruptcy court found them to be an avoidable preference whether viewed as a transfer under section 547(b) or an improper setoff under section 553(b). To the extent Marine acquired funds in excess of the amount owed on the note, the bankruptcy court ruled they could be recovered from Gateway as an indirect preference.
 
 
 65
 The district court reversed the bankruptcy court's finding as to Gateway. It ruled that the seizure of funds could only be viewed as a setoff under 11 U.S.C. Sec. 553. Since setoffs were purposely excluded from the definition of transfer in 11 U.S.C. Sec. 101(40), the court held, they could not be avoided as an improper transfer under section 547(b) or pursuant to the trustee's power to recover from indirect beneficiaries under the version of section 550(a) that applied at the time. While section 553(b) contained its own preference provision, this only provided for recovery from a "creditor [who] offsets a mutual debt" and made no mention of recovery from any third party who may have indirectly benefited by the setoff. Therefore, the court concluded, Gateway could not be said to have benefited from the positive balances in Prescott's accounts.
 
 
 66
 Even noting that it was Marine's action which directly effected the setoff, we disagree with the district court's finding with respect to the indirect benefit to Gateway. Under the Bankruptcy Act of 1898, setoffs were generally not avoidable as preferences. See Jensen v. State Bank of Allison, 518 F.2d 1 (8th Cir.1975). However, this created certain problems. "The setoff upset the scheme of equitable distribution and bankruptcy policy with respect to recovery of preferences." In re Balducci Oil Co., 33 B.R. 847, 852 (Bankr.D.Colo.1983). When drafting the new Bankruptcy Code, therefore, Congress decided to impose certain limitations on the right of setoff. One possible limitation proposed in the original House Resolution was to include "setoff" in the general definition of transfer, thus enabling its consideration under section 547(b). The Senate rejected this approach of treating setoffs as transfers, however, and chose instead to subject them to special rules. See Statement by Senator DeConcini, Senate Debate on the Compromise Bill to H.R. 8200, 124 Cong. Rec. at 33,993 (95th Cong.2d Sess. October 5, 1978).
 
 
 67
 Section 553(b) was the special rule adopted by Congress to govern preferential setoffs. This rule provides:
 
 
 68
 (b)(1) Except with respect to a setoff of a kind described in section 362(b)(6), 362(b)(7), 365(h)(2), or 365(i)(2) of this title, if a creditor offsets a mutual debt owing to the debtor against a claim against the debtor on or within 90 days before the date of the filing of the petition, then the trustee may recover from such creditor the amount so offset to the extent that any insufficiency on the date of such setoff is less than the insufficiency on the latter of--
 
 
 69
 (A) 90 days before the date of the filing of the petition; and
 
 
 70
 (B) the first date during the 90 days immediately preceding the date of the filing of the petition on which there is an insufficiency.
 
 
 71
 The function of this provision was explained in In re Schmidt, 26 B.R. 89, 92 (Bankr.D.Minn.1982):
 
 
 72
 The effect of this Subsection [553(b) ] is to allow the Trustee to recover the setoffs which advance the position of one creditor at the expense of all other creditors during the ninety day period before bankruptcy. It works hand-in-hand with the philosophy of Section 547.
 
 
 73
 This miniature preference provision was designed to close former loopholes. See 4 Collier p 553.02 at 553-9 ("[W]hat is evident on comparison of Section 553 to its predecessor, Section 68 of the Chandler Act, is that the earlier setoff provision is now considered to have been too broad. The result was that in too many cases, certain creditors received a preference to the detriment of other creditors and the debtor's estate. Consequently, Section 553 has restricted the right of setoff beyond what was done in earlier acts, and contains restrictions somewhat similar to those found in the preference section.") (footnote omitted).
 
 
 74
 The purposes of closing loopholes and promoting evenhandedness should be kept in mind in deciphering Congress's intent regarding the treatment of parties that indirectly benefit from setoffs. While it is true that the language of section 553(b) makes no mention of indirect beneficiaries, neither does the statute or its history evince an intent that indirect beneficiaries are to be exempt from the trustee's avoiding power. The question of how indirect beneficiaries should fare does not appear to have been directly answered in the Code.
 
 
 75
 Perhaps one reason why section 553 does not expressly address indirect beneficiaries is that these parties do not actually engage in any process of setoff and thus need not be subject to the specifics of the setoff statute. As seen in the instant case, Gateway has no mutual obligation to Prescott. It was not custodian of any accounts that could be applied against Prescott's debts. Rather, Gateway merely realized an appreciation in the value of its collateral when Marine--the party that did have access to such accounts--exercised its own power of setoff. What Gateway received may be characterized as a transfer that may be considered under section 547(b) and the 1978 version of section 550(a) even though this transfer flowed from another creditor's action under section 553.
 
 
 76
 Any doubt that Congress intended for the trustee to be able to reach benefits that indirect beneficiaries realize through other creditors' setoffs was resolved when Congress in 1984 amended section 550(a) to include section 553(b). While this version of section 550(a) does not apply in this case, it is useful in illuminating Congress's aims. Nothing suggests that this amendment was intended to broaden the trustee's avoiding power or reach new parties that were beyond the 1978 statute's grasp. Rather, this amendment made only "minor technical changes," see Herzog & King, Bankruptcy Code, 1986 Collier Pamphlet Edition at 366, designed to clarify Congress's meaning. What was implicit before is now clear: the trustee may reach any party that inequitably benefits from a setoff during the preference period.
 
 
 77
 To conclude that indirect beneficiaries are beyond the trustee's reach would undermine the purpose of the preference provision that general unsecured creditors share evenly in the bankruptcy estate. The district court's decision would allow Gateway's security interest to grow to the detriment of other general creditors. Such a result cannot stand.
 
 V. Gateway's 547(c) Defenses
 
 78
 The trustee's second argument on his cross-appeal is that the district court erred in finding that Gateway had extended Prescott new value during the preference period. The district court held that Gateway could not be deemed to have benefited from Marine's receipt of the certificate of deposit on March 17 because it afterwards advanced new credit worth over $96,500.[5] The court determined that this credit was unsecured as required by 11 U.S.C. Sec. 547(c)(4) because Gateway was unsecured on its total advances to Prescott by at least $600,000.
 
 
 79
 As we noted earlier, the theory behind the "subsequent advance" exception to the trustee's avoiding power is that to the extent unsecured new value is given to the debtor after a preferential transfer is made, the preference is repaid to the bankruptcy estate. The creditor that raises a "subsequent advance" defense has the burden of establishing that new value was extended, which remains unsecured and unpaid after the preferential transfer. See In re Saco Local Development Corp., 30 B.R. at 861. What is important is that the new value be unsecured, not that the creditor in general be unsecured. As the court explained in In re Formed Tubes, Inc.:
 
 
 80
 If the creditor obtains a security interest to secure payment of the new value or is paid for the new value by the debtor, there is in effect no return of the preference and the section 547(c)4 defense is not available to the creditor.
 
 
 81
 46 B.R. at 647; see also In re American International Airways, Inc., 56 B.R. 551, 554 (Bankr. E.D.Pa.1986). Here, while Gateway was generally an unsecured creditor, it retained a purchase money security interest in the $96,500 worth of inventory advanced after March 17. The new inventory was therefore secured. On the liquidation of Prescott's estate, Gateway presumably would retake possession of that inventory and nothing would be left for distribution to the general creditors. Therefore, the requirements of section 547(c)(4) have not been fulfilled, and the district court's finding of new value must be reversed.
 
 VI. Valuation of Gateway's Security
 
 82
 Gateway held a junior interest in the collateral of the East Washington store in which Marine held a senior interest. As the debt secured by Marine's interest was reduced, therefore, Gateway enjoyed a corresponding increase in the value of its security interest. The bankruptcy court found that during the preference period Gateway's security interest increased in value from $0 to $59,643.71. In order to arrive at this figure, the bankruptcy court first had to assess the value of Marine's collateral on March 16. Gateway, like Marine, contends that no evidence was introduced to establish this value. As we have already determined that the bankruptcy court's assessment of the value of Marine's collateral on March 16 was not clearly erroneous, we affirm the court's findings as to the size of Gateway's preference.
 
 
 83
 For the foregoing reasons the judgment of the district court is AFFIRMED in part and REVERSED in part.
 
 
 
 [1]
 The bankruptcy court originally listed the amount of the overdrafts as $50,546.84. The district court adopted this figure in assessing Gateway's liability for the overdrafts. This results in a 76 cent discrepancy between the two opinions
 
 
 [2]
 Gateway also benefited from the improvement in Marine's position in its role as guarantor on the declining balance of Prescott's note from Marine. The bankruptcy court valued this benefit as $20,366.66--one-half of Marine's unsecured claim that was paid by the transfer. However, as Prescott's estate was only depleted by $59,643.71, the bankruptcy court ruled the additional $20,366.66 could not be avoided under Sec. 547
 
 
 [3]
 The bankruptcy court arrived at this figure because the repayment of the overdrafts reduced the debt secured by the $130,000 inventory and $1,734 bank account to approximately $123,000. The setoff of the $18,353.59 in the seized accounts reduced that debt to approximately $104,646.41. The proceeds of $34,290.12 from the certificate of deposit reduced that debt to $70,356.29. Since Marine's security exceeded its debt by $59,643.71, the value of Gateway's security interest appreciated in value from $0 to this amount
 The bankruptcy court apparently assumed that as long as Marine was undersecured, the improvement in the value of Marine's security up to the level of its debt did not redound to Gateway's benefit. After the value of the security equaled the level of debt, any improvement in Marine's position beyond this point resulted in a corresponding dollar-for-dollar increase in the value of Gateway's security and thus a preference for this amount.
 
 
 [4]
 WIS.STAT. Sec. 409.305 provides:
 A security interest in letters of credit and advices of credit ... goods, instruments, money, negotiable documents or chattel paper may be perfected by the secured party's taking possession of the collateral.... A security interest is perfected by possession from the time possession is taken without relation back and continues only so long as possession is retained, unless otherwise specified in this chapter. The security interest may be otherwise perfected as provided in this chapter before or after the period of possession by the secured party.
 
 
 [5]
 At trial, Gateway offered testimony that between March 17 and March 31, 1983, it made advances and extended credit to Prescott totaling $148,479.48. Gateway was only reimbursed $51,900 for these advances. Therefore, the district court determined that Gateway had extended the remainder as new value