### In re John Christopher POLLOCK, Jr., Debtor.

**Bankruptcy No. 85–03340T.**

United States Bankruptcy Court, E.D. Pennsylvania.

Sept. 21, 1988.

748

Kenneth S. Schreffler, Connolly, Chandor & McAndrews, Warminster, Pa., for debtor.

J. Ralph McClelland, Marietta, Ga., for Marilee C. Pollock.

## MEMORANDUM OPINION

THOMAS M. TWARDOWSKI, Bankruptcy Judge.

John Christopher Pollock, Jr. ("debtor") has objected to the proof of claim filed by his ex-wife, Marilee C. Pollock ("claimant"), on the grounds that 11 U.S.C. § 523 does not prohibit the discharge of the following debts, each of which originated in orders related to the 1981 divorce of the parties: (1) that portion of child support arrearages allegedly modified downward by a court order subsequent to the initial order on which the arrearages are based; (2) alimony and alimony arrearages; (3) premiums due on a life insurance policy; (4) attorney's fees incurred by claimant as a result of claimant's attempt to get court-ordered support from debtor, and (5) a joint income tax obligation.[1] On the unusual facts of this case, we hold that the attorney's fees and tax obligations are dischargeable, that the alimony and life insurance obligations are non-dischargeable, that child support

---

1. Debtor objects to the claim and alleges that it is non-dischargeable. Under N.B.R. 3007, when an objection to a claim is joined with one of the types of relief listed in N.B.R. 7001, it becomes an adversary proceeding. Accordingly, this opinion constitutes the findings of fact and conclusions of law required by N.B.R. 7052 and Rule 52 of the Federal Rules of Civil Procedure.

arrears under the Georgia order became fixed and non-dischargeable at $3,939.00 on May 27, 1983, and that the child support arrears that accumulated under the Pennsylvania orders subsequent to that date are non-dischargeable.

## I BACKGROUND

Prior to the filing of this chapter 13 petition, debtor and his former spouse, claimant, had been involved in a long series of domestic relations proceedings in the Georgia and Pennsylvania courts. The parties appear to agree that the history of this case began in April of 1981, during the course of divorce proceedings, when a Georgia court entered an order covering temporary alimony and certain joint debts.[2] The parties were divorced on June 17, 1981 by order of the Georgia court, which reserved decision on certain issues related to the divorce. On August 20, 1981, the Georgia court issued its "Judgment on Issues Reserved," which was specifically incorporated into the judgment and decree of divorce, and which provided for alimony ($900.00/month for seven years) and child support ($1,500.00/month until majority for three children). It also ordered debtor to name claimant and their three children as the primary and sole beneficiaries under his life insurance policies and to keep each of the policies in full force and effect.

As a result of debtor's failure to comply with these obligations, a contempt hearing was held on November 24, 1981. At that time, debtor was ordered to pay all of the above obligations. He was specifically ordered to pay any and all sums due to the Internal Revenue Service ("I.R.S.") as a result of a 1980 tax return jointly filed by

debtor and claimant, the subject of which was covered by paragraph 4 of the April 10, 1981 agreement covering debtor's assumption of joint marital debts.

In late 1982, after locating debtor in Pennsylvania, claimant[3] initiated a petition in Georgia under the Uniform Reciprocal Enforcement of Support Act ("URESA").[4] As a result of the URESA petition, the Pennsylvania court entered an order reducing debtor's monthly child support obligations. Additional Pennsylvania proceedings and orders ensued.

On August 13, 1985, debtor filed the instant chapter 13 petition. Claimant filed her Proof of Claim on December 19, 1985, in the amount of $72,060.04 "exclusive of interest," based on "alimony, child support, attorney's fees and federal income tax arising out of divorce case." Debtor then filed an Objection to the Proof of Claim, the sole substance of which was that the attorney's fee obligation was not dischargeable. Debtor's other "objections" to this proof of claim have been set forth in the Memoranda and through oral argument. Claimant filed a Response to the Objection. Paragraph 2 of claimant's Response referenced an attached itemization which reflected a balance due claimant of $76,210.04, rather than the $72,060.04 listed on the proof of claim. Claimant further stated that she was using the response to "amend" her proof of claim.

After trial and the submission of memoranda, we signed a post-trial order requesting that the parties jointly provide additional information regarding each component of the proof of claim. Debtor filed an individual Response. A document cap-

---

**2.** Piecing together the history of this case, it appears that the April 20, 1981 order provided for temporary alimony, as well as debtor's assumption of certain marital debts. The order itself is not clearly described in the pleadings and no copy has been provided to this Court.

**3.** Each side claims that it initiated the URESA support proceeding. *Cf.* N.T. June 3, 1986, p. 4 (Testimony of debtor), and Claimant's memorandum, p. 2. However, the transcript of the initial Pennsylvania modification hearing, dated May 6, 1983, indicates that the *petitioner* resided

in the State of Georgia. This is clearly a reference to claimant.

**4.** The acronym "URESA" is used to describe the initial version of the Act, which has been incorporated into the Georgia statutes. Many states, including Pennsylvania, have adopted the revised version of URESA, often known as RURESA. For simplicity and clarity, all references in this opinion will be to URESA, but should be read to mean the Act as adopted in the state to whose laws we refer.

tioned "Joint⁵ Response" was also filed. The Joint Response provided yet another revision of the calculations offered by claimant. This revision decreases the amount of the claim to $55,850.14, and notes that there were certain "credits" originally overlooked by claimant. Claimant describes the figures in the Joint Response as an "amendment" to her claim; in actuality it would be an amendment to the amendment.

At trial, debtor and his counsel appeared and debtor offered brief testimony. Claimant and her counsel were unable to attend, but, given her distant domicile, we refused to take the position that the failure to appear "personally as opposed to through their written response results in their having waived any right to press their claim or anything of that nature." N.T. June 3, 1986, p. 12. This still requires us to identify those items properly admitted as evidence, which consist of the three Pennsylvania URESA orders. N.T. June 3, 1986, p. 8, 10. Further, since both parties have attached to their pleadings copies of the August 21, 1981 Judgment on Issues Reserved, we will treat these submissions as a stipulation as to the authenticity of that document. Thus, we confront this extremely complex case with only four pieces of documentary evidence.

## II PRELIMINARY ISSUES

### A. Waiver

■ This unusual fact pattern requires that we confront two preliminary issues: (1) whether debtor's failure to raise in his objection any specific objections other than the dischargeability of the attorney's fees serves to waive his later written and oral objections regarding alimony, child support, income taxes and life insurance, and (2) whether Claimant's Response to Debtor's Objection and the "Joint Response" serve to amend her proof of claim.

The waiver issue is governed by Rule 15(b) of the Federal Rules of Civil Procedure,⁶ which provides:

(b) Amendments to Conform to the Evidence. When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings. Such amendment of the pleadings as may be necessary to cause them to conform to the evidence and to raise these issues may be made upon motion of any party at any time, even after judgment; but failure so to amend does not affect the result of the trial on these issues ...

The purpose behind Rule 15(b) is to maximize the chance that claims will be decided on their merits, rather than on technical points of pleading. *In re Prescott (Appeal of Marine Bank)*, 805 F.2d 719, 725 (7th Cir.1986).

When interpreting Rule 15(b), the key is consent. Did the opposing party have a fair chance to defend against the "new" claim; could he have presented additional evidence had he known sooner? *Id.* at 725. *Accord, Rokowsky v. Gordon*, 531 F.Supp. 435, 437 (D.Mass.1982), *aff'd* 705 F.2d 439 (1st Cir.1983), *cert. den.* 462 U.S. 1120, 103 S.Ct. 3089, 77 L.Ed.2d 1350 (1983). Of course, consent may be expressed or implied. Courts will find implied consent when issues not raised in pleadings are presented at trial and argued without objection. *Southeastern Sprinkler Co., Inc. v. Meyertech Corp. (In re Meyertech)*, 831 F.2d 410, 422 (3rd Cir.1987); *In re Prescott*, 805 F.2d 719, 725, *citing Apple Barrel Productions, Inc. v. Beard*, 730 F.2d 384, 389 (5th Cir.1984); *Gallegos v. Stokes*, 593 F.2d 372 (10th Cir.1979); *B.Z. Corp. v. Continental Bank (In re B.Z. Corp.)*, 34 B.R. 546, 549 (Bankr.E.D.Pa.1983). Not surprisingly, implied consent may be found when the opposing party presents evidence on matters not yet pled by movant. *In re Prescott*, 805 F.2d 719, 725.

---

**5.** Although the document is captioned "Joint Response," and contains a signature line for debtor's counsel, it is signed only by counsel for claimant. This, coupled with the fact that debtor has filed his own separate response, leads us to believe that no "joint" stipulation exists.

**6.** This rule is incorporated into the National Bankruptcy Rules by N.B.R. 7015.

In the instant case, claimant has failed to object that debtor has raised in his oral and written arguments dischargeability issues not found in his original Objection. Indeed, both parties have briefed and argued the dischargeability questions listed at the beginning of this opinion. Thus, our ruling on these matters cannot conceivably prejudice claimant, who has impliedly consented to the inclusion of these issues.

### B. *Amendment*

■ Debtor has not objected to either of claimant's attempts to amend her proof of claim. Since the attempted amendments would decrease the total amount claimed as nondischargeable, we are particularly willing to accept this attempted amendment. When an initial proof of claim is timely, courts will allow amendments to increase the amount of the proof of claim, if the amendment does not set up a new, different or separate claim. *See generally, In re Ungar,* 70 B.R. 519, 522, 16 C.B.C.2d 467, 470–73, 15 B.C.D. 845, Bankr.L.Rep. para. 71,697 (Bankr.E.D.Pa.1987) (failure to list any dollar amount in an objection to confirmation was not a bar to treating that pleading as an informal proof of claim). *See also, In re Globe Solvents,* 397 F.Supp. 544, 547 (E.D.Pa.1975); *Fidelity Deposit Co. of Md. v. Fitzgerald,* 272 F.2d 121, 130 (10th Cir.1959), *cert. den.* 362 U.S. 919, 80 S.Ct. 669, 4 L.Ed.2d 738 (1960); *Continental Motors Corp. v. Morris,* 169 F.2d 315, 317 (10th Cir.1948); *Industrial Commissioner v. Schneider,* 162 F.2d 847, 849 (2d Cir.1947). We freely allow amendments to proofs of claim absent contrary equitable considerations. *United States of America v. Owens,* 84 B.R. 361, 363 (E.D.Pa.1988).

## III DISCUSSION

### A. *Burden Of Proof*

The starting point for our analysis must be the Code provisions governing dischargeability. Section 523(a)(5) provides that a discharge does not discharge a debtor from any debt:

> ... to a spouse, former spouse, or child of the debtor, for alimony to, maintenance for, or support of such spouse or child, in connection with a separation agreement, divorce decree or other order of a court of record, determination made in accordance with state or territorial law by a governmental unit, or property settlement agreement, but not to the extent that—
>
> (A) such debt is assigned to another entity, voluntarily, by operation of law, or otherwise (other than debts assigned pursuant to section 402(a)(26) of the Social Security Act, or any such debt which has been assigned to the Federal Government or to a State or any political subdivision of such State); or
>
> (B) such debt includes a liability designated as alimony, maintenance, or support, unless such liability is actually in the nature of alimony, maintenance, or support; ...

11 U.S.C. § 523(a)(5).

■ In reviewing this fact pattern, our guiding principle is that:

> The legislative history of sect. 523(a)(5) explicitly states that the determination as to what debts constitute alimony, maintenance, or support is to be made according to the federal bankruptcy law, not state law. See House Report 95–595, 95th Cong. and Admin. News 5787, 5963, 6320; Senate Report No. 95–989, 95th Cong.2d Sess. (1978) 79, *reprinted in* 1978 U.S.Code Cong. and Admin. News 5787, 5865.

*Miller v. Miller (In re Miller),* 34 B.R. 289, 291 (Bankr.E.D.Pa.1983). Accordingly, we are not bound by the characterizations made in the Divorce Decree, Temporary Order or Judgment on Issues Reserved, but we may look behind the form of these orders to determine the substance of the agreed payments. *Allshouse v. Allshouse (In re Allshouse),* 34 B.R. 512 (Bankr.W.D. Pa.1983).

■ Two competing federal policies shape our review. We must balance the interest of the debtor in obtaining a fresh start against the concern that a former spouse, and not society in general, should be responsible for the maintenance and

support of members of the spouse's family, *Alloway v. Alloway (In re Alloway)*, 37 B.R. 420, 425, Bankr.L.Rep. para. 69,764 (Bankr.E.D.Pa.1984).

■ Determining the appropriate burden of proof is difficult. This is a hybrid proceeding; an objection to a proof of claim transformed into an adversary by virtue of N.B.R. 3007. On one hand, N.B.R. 3001(f) states that any "proof of claim executed and filed in accordance with these rules shall constitute prima facie evidence of the validity and amount of the claim." Thus, "... a claim has a presumption of validity until a party objecting to the claim has introduced evidence sufficient to rebut the claimant's prima facie case." *In re Harmon*, 72 B.R. 458 (Bankr.E.D.Pa.1987). *Accord, In re Baker*, 49 B.R. 240 (Bankr.E.D.Pa.1985). On the other hand, the burden of proof on § 523(a)(5) dischargeability issues is always on the complaining spouse who must show that the debt is actually non-dischargeable alimony, maintenance or support. *Long v. West (In re Long)*, 794 F.2d 928, 930 (4th Cir.1986); *Tilley v. Jessee (In re Tilley)*, 789 F.2d 1074 (4th Cir. 1986); *Pitzen v. Pitzen (In re Pitzen)*, 73 B.R. 10, 12 (Bankr.N.D.Ohio 1986); *In re Alloway*, 37 B.R. 420, 423; *Lineberry v. Lineberry (In re Lineberry)*, 9 B.R. 700, 706 (Bankr.W.D.Mo.1981).

Confronting a similar dilemma involving a "choice of burden," the bankruptcy court for the Middle District of Tennessee applied *both* burdens of proof to analyze a case, noting that it reached the same conclusion regardless of the burden that it applied. *Twinton Properties Partnership v. Nidiffer (In re Twinton Properties Partnership)*, 44 B.R. 426 (Bankr.M.D. Tenn.1984). In *Twinton*, a creditor filed a proof of claim which was actually a claim that he owned property held by debtor. Under N.B.R. 7001(2) and 7001(9), such claims are properly raised in an adversary context. *Id.* at 428. Although applying two different burdens (one based on the nature of state law ownership rights and the other the traditional burden applied in claims objections), the opinion can be interpreted to suggest that we may "recharac-

terize" this lawsuit as an adversary proceeding. *Id.* at 430. Such an interpretation is consistent with other decisions in which courts assume, without discussion, that the appropriate burden to be applied is the burden imposed by the substantive issue. *See e.g., Dial v. Presler (In re Presler)*, 34 B.R. 895, 897 (Bankr.M.D.Tenn. 1983) (when wife filed a proof of claim and the matter was heard on the dischargeability issue, without discussing the "choice of burden" the court assigned the burden to the spouse asserting that the claim was non-dischargeable and not on the objecting spouse); *In re Magic Circle Energy Corp.*, 64 B.R. 269, 272, n. 6, 15 C.B.C.2d 658, 14 B.C.D. 969, Bankr.L.Rep. para. 71,444 (Bankr.W.D.Okla.1986) (when creditor filed a proof of claim and debtor objected that the creditor had received a voidable transfer, the court placed the burden on the creditor because it was the creditor's burden, under § 547, to prove non-avoidability). Thus, claimant carries the burden of proving non-dischargeability.

This is a hybrid proceeding; a proof of claim that turns on substantive dischargeability issues. The two are linked by the fact that a decision that any portion of this claim is dischargeable under § 523 will fit that obligation within the scope of § 502(b)(1), which provides that the court need not allow a claim that is "unenforceable against the debtor or property of the debtor, under any agreement or applicable law or for a reason other than because such claim is contingent or unmatured."

### B. *Factors Used To Aid In Characterization Of Property*

■ In our initial § 523(a)(5) decision, we set forth three factors to aid in determining when a particular obligation is in the nature of alimony, maintenance or support, and thus non-dischargeable: (1) the intention of the parties when the obligation was created; (2) the financial circumstances and needs of both parties, focusing heavily on the need of the party opposing dischargeability at the time that the obligation was created and (3) the function that the obligation serves. *In re Miller*, 34 B.R. 289, 292. These factors need not be considered

alone, and we are willing to consider other factors, including the duration of the marriage and the existence of children. *Id.*

In the nearly five years since we issued our opinion in *Miller,* innumerable courts have developed their own lists of criteria for testing the essential nature of § 523(a)(5) payments alleged to be non-dischargeable.[7] *See e.g., Stone v. Stone (In re Stone),* 79 B.R. 633, 16 B.C.D. 971, Bankr.L.Rep. para. 72,033 (Bankr.D.Md. 1987); *Young v. Young (In re Young),* 72 B.R. 450, Bankr.L.Rep. para. 71,784 (Bankr.D.R.I.1987) (seven factors); *Guerron v. Grijalva (In re Grijalva),* 72 B.R. 334 (S.D.W.Va.1987) (12 factors); *In re Coffman,* 52 B.R. 667, 13 C.B.C.2d 553, Bankr.L.Rep. ¶ 70,741 (Bankr.D.Md.1985) (18 factors).

Determining how these factors are to be balanced and analyzed is more problematic. The Third Circuit has not yet ruled that any one specific test must be applied. A leading opinion on this subject, however, comes from the Sixth Circuit. *Long v. Calhoun (In re Calhoun),* 715 F.2d 1103 (6th Cir.1983). The essence of the lengthy *Calhoun* opinion is that courts must engage in a four part test to assess the true nature of these payments. First, the court must ascertain the *intent* of the parties. Next, the court must determine whether the provision being scrutinized has the *effect* of providing support. Assuming that the provision is viewed as support, the court must determine whether the amount of support is so *excessive* as to be unreasonable. Finally, the court must decide how much of any given obligation should be characterized as non-dischargeable for the purposes of bankruptcy law. *Id.* at 1109-11. Although there are criticisms

of the *Calhoun* approach, *see e.g., Forsdick v. Turgeon,* 812 F.2d 801 (2d Cir.1987) (stating that a portion of the *Calhoun* analysis represents a minority view), we find *Calhoun* particularly persuasive because it encompasses considerations set forth in our *Miller* decision.

Courts have used a variety of approaches to ascertain intent, which is the first part of both the *Calhoun* evaluation and our *Miller* analysis. The *Calhoun* court suggested that we may consider any relevant evidence, including those factors utilized by the state court in creating the underlying award. *Id.* at 1109. Another court has relied on a state court's "explicitly rendered" conclusions of intent. *Long v. West (In re Long),* 794 F.2d 928 (4th Cir.1986). As a general proposition, however, bankruptcy courts have been given wide discretion in determining what factors to consider when evaluating intent. *See generally, Benich v. Benich (In re Benich),* 811 F.2d 943 (5th Cir.1987).

The intent of the parties must often be divined from circumstantial evidence:

> This determination of intent is particularly difficult since the designations used by the parties or the divorce court in denominating whether a debt is alimony or part of a property settlement are not conclusive although due consideration to those labels is afforded her ... Further compounding the problem is the fact that, at the time the alimony is awarded and the property divided, very often the parties have no intent to differentiate between an alimony debt and a property settlement debt and will view both merely as financial obligations arising from the separation or divorce. The parties would

---

7. Summarizing much of this case law, former Chief Judge Goldhaber identified some of the factors relevant in distinguishing payments in the nature of alimony from a property settlement debt:

> The label given to the debt by the parties and the state court; the express terms of the debt provision at issue in the settlement agreement or decree and its placement in the context of the document; whether the obligation is payable in installments over a substantial period of time or is a lump sum payment; whether the obligation terminates on the occurrence

of a condition such as the spouse's remarriage or death; whether the debt was allocated in lieu of a greater allowance of alimony; the relative income of the parties; the length of the marriage; children from the marriage who require support; whether the support award would be inadequate absent assumption of the debt; whether the debt was incurred for a necessity; and whether the debt is a past or future obligation. (citations omitted)

*Alloway v. Alloway (In re Alloway),* 37 B.R. 420, 425.

have no purpose or rationale in making the distinction without some awareness of the legal consequences of the choice such as that found in the disciplines of tax and bankruptcy law. Since the parties have no actual intent to make the distinction we must usually establish their constructive intent from the facts and circumstances of the case.

*In re Alloway,* 37 B.R. 420, 425.

### C. *Specific Payments Alleged to be Nondischargeable*

#### 1) Child Support

In the instant case, we begin with the past due child support obligation, which originated in the Judgment on Issues Reserved. Paragraph 7 of that document provides:

> Beginning July 1, 1981, and continuing on the 1st day of each month thereafter until each child reaches eighteen (18) years of age, Defendant shall pay to the Plaintiff for the support and maintenance of each minor child the sum of Five Hundred ($500.00) Dollars per month, or a total of Fifteen Hundred ($1,500.00) Dollars per month. As and when each child becomes eighteen (18) years of age, the specified monthly payments for that child shall cease.

Debtor does not appear to object to the characterization of these payments as non-dischargeable support. Rather, he requests that we find that the total arrears under the Georgia order be reduced as a result of three subsequent URESA orders entered in Pennsylvania, which allegedly modified his support obligation downward. Our analysis is complicated by the fact that the parties have yet to provide us with a cogent summary of the exact amount of child support arrearages and other dollar figures. This interstate chaos is exacerbat-

ed by the fact that debtor claims that Georgia is not giving full faith and credit to the three Pennsylvania orders. We must examine the choice of law and the statutory provisions covering modification of earlier orders before we can decide (1) whether the Pennsylvania orders had any impact on the amount of arrears owed under the Georgia order, and (2) whether the entry of the Pennsylvania order served to halt the accumulation of arrearages under the Georgia order.

#### (a) *Choice of Law Under URESA*

■ Claimant initiated her URESA action against debtor on December 18, 1982. At that time, a uniform reciprocal support law had been enacted in both Pennsylvania and Georgia, and the relevant statutory provisions were found at 42 Pa. Cons.Stat. Ann. §§ 6741–6780 (Purdon 1982) (1976 Pa. Laws 586 No. 142, § 2 effective June 27, 1978) and O.C.G.A. §§ 19–11–40—19–11–81 (1982) (1958 Ga.Laws, p. 34, § 1 *et seq.* as amended).[8] The version of URESA enacted in Pennsylvania specifically stated that a support order issued in a URESA action which was lower than the original support order did not modify the original support order, "unless otherwise specifically provided by the court:"

> *A support order made by a court of this Commonwealth* pursuant to this subchapter *does not nullify* and is not nullified by *a support order* made by a court of this Commonwealth pursuant to any other law or by a *support order made by a court of any other state* pursuant to a substantially similar law or any other law, regardless of priority of issuance, *unless otherwise specifically provided by the court.* Amounts paid for a particular period pursuant to any support order made by the court of an-

---

**8.** The Pennsylvania act was originally codified at 62 P.S. §§ 2043–1 *et seq.* 1951 Pa.Laws No. 855. As amended in 1953 and 1959, this eventually became 62 P.S. §§ 2043–1—2043–44. In 1976 it was reenacted as part of the Judicial Code at 42 Pa.C.S.A. §§ 6741 to 6780. The Pennsylvania legislature has since reenacted the legislation at 23 Pa.C.S.A. §§ 4501–4540, pursuant to 1985 Pa.Laws 264, No. 66, 1 (passed October 30, 1985 and effective 90 days after passage). The Georgia legislature originally passed the 1950 version of URESA, and then reenacted it to conform with the 1958 revisions to URESA. Since that time, they have revised portions of the act on a piecemeal basis. The Georgia legislation is codified in both "official" volumes (O.C.G.A. §§ 19–11–40—19–11–81 (1982)) and "unofficial" volumes (Ga.Code Ann. § 99–901a to § 99–939a (Harrison 1981 revisions).

other state shall be credited against the amounts accruing or accrued for the same period under any support order made by the court of this Commonwealth.

42 Pa. Cons.Stat.Ann. § 6771 (Purdon 1982) (emphasis added). The analogous Georgia statute does not include the "unless otherwise specifically provided" language:

Any order of support issued by a court of this State when acting as a responding State shall not supersede any previous order of support issued in a divorce or separate maintenance action, but the amounts for a particular period paid pursuant to either order shall be credited against amounts accruing or accrued for the same period under both.

O.C.G.A. § 19–11–71 (1982) (1958 Ga.Laws, p. 34, § 26); Ga.Code Ann. § 99–927a (Harrison 1981).

Our first task must thus be to determine whether the Georgia or the Pennsylvania language controls our analysis. The choice of law provision in the Pennsylvania statute reads:

Duties of support applicable under this chapter are those imposed under the laws of any State where the obligator was present for the period during which support is sought. The obligator is presumed to have been present in the responding state during the period for which support is sought until otherwise shown.

23 Pa.C.S.A. § 4507 (current law); 42 Pa.C. S.A. § 6757 (in effect at time of the instant support proceedings), repealed by P.L. 264, No. 66, October 30, 1985. The Georgia statute is identical O.C.G.A. § 19–11–49; Ga.Code Ann. § 99–907a (Harrison 1981) (1958 Ga.Laws, p. 34, § 6).

Under these circumstances, we have no difficulty finding that the peculiar "unless

otherwise provided" language of the Pennsylvania statute governs this matter. *See generally, Oman v. Oman,* 333 Pa.Super. 356, 482 A.2d 606 (1984); *Chrzanowski v. Chrzanowski,* 325 Pa.Super. 298, 472 A.2d 1128 (1984).

(b) *Did the Pennsylvania Order Nullify Portions of the Georgia Order?*

■ It is far more difficult to interpret the meaning of the "unless otherwise provided" language. Our research has uncovered no case law or legislative history elaborating on the nuances of these words.[9] It appears that Pennsylvania may be the only state adding such a caveat to its law. 9B *Uniform Laws Annotated,* 31, p. 531 (West's 1987). Lacking a convenient oracle from which to obtain a literal interpretation, we start with the basic proposition that any interpretation of this phrase must be consonant with our governing law, the Constitution of the United States. Article VI, § 1 of the Constitution provides that: "Full Faith and Credit shall be given in each State to the Public Acts, Records and Judicial Proceedings of every other State." Thus, our interpretation of the "unless otherwise specifically provided" language must be one which affords full faith and credit to the prior Georgia decisions.

The Pennsylvania reciprocal support cases provide a framework for the application of the Full Faith and Credit clause in this setting. In the *Oman* case, a divorced father brought an action to terminate support for his daughter on her eighteenth birthday. *Oman v. Oman,* 333 Pa.Super. 356, 482 A.2d 606 (1984). Relying on *Silverstein v. Silverstein,* 246 Pa.Super. 503, 371 A.2d 948 (1977), the *Oman* court noted that Full Faith and Credit need not be provided when the subject order was modifiable in the other jurisdiction.[10] *Oman*

---

**9.** The statute is cited in two other cases, but in neither of these cases does the court discuss the "unless otherwise specifically provided" language. *See e.g., Commonwealth v. McClelland,* 303 Pa.Super. 540, 450 A.2d 58 (1982); *Myers v. Young,* 285 Pa.Super. 254, 427 A.2d 209 (1981).

**10.** We are aware of a Pennsylvania Superior court decision that may be read for the proposition that a court should look to the law of

Pennsylvania, and not the law of the foreign jurisdiction, when determining if an order was final and non-modifiable. *Chrzanowski v. Chrzanowski,* 325 Pa.Super. 298, 472 A.2d 1128 (1984). We suspect that the *Chrzanowski* court compressed two steps of analysis into one: the choice of law issue and the determination of modifiability. It appears that they may have taken the broad choice of law rule, which required them to choose Pennsylvania law, and

stands for the further proposition that even when the order in the originating state is final and non-modifiable, a Pennsylvania court is not compelled to recognize that order if it contravenes Pennsylvania's public policy. *Id.* 482 A.2d at 610. In *Oman,* the act of recognizing the Virginia order, which did not require payments to the daughter while she was in college, contravened the policy recognized in Pennsylvania that parents have a duty to provide support during that period.

The Pennsylvania Supreme Court has stated:

> A foreign decree for the support of children, to be entitled to recognition and enforcement in another state, must be *a final judgment for a fixed* sum, and if, under the law of the foreign state such order is subject to modification at the discretion of the court, the order is not a final judgment which may be enforced in Pennsylvania.

*Posner v. Sheridan,* 451 Pa. 51, 57, 299 A.2d 309, 312 (1973). To complicate our determination of whether the Georgia Orders were final, we must consider finality and modifiability in the context of the two types of child support claimed as dischargeable by debtor.

### (c) *Application of the Pennsylvania Statute and Laws*

■ In the instant case, debtor makes two points which require separate analysis. First, he argues that the Pennsylvania court order served to modify the *arrearages* that he owed under the Georgia order. Under Georgia law, a court cannot modify arrearages owed. *See Skinner v. Skinner,* 252 Ga. 512, 314 S.E.2d 897, 899 (1984); *Childers v. Childers,* 373 So.2d 1388 (La.App.1979), and cases cited therein. Thus, a Pennsylvania court order would give full faith and credit to the arrearages

accumulated under a Georgia order.[11] Whether the Pennsylvania court in this case *properly* accorded full faith and credit to the arrearage portion of the Georgia order is a question that we need not reach. We are limited in our inquiry by the evidence that has been put into the record. The only evidence on arrears with which we have been presented is the May 6, 1983 bench order of the Bucks County Court, the relevant portion of which reads as follows:

> So it proposed that Mr. Pollock continue to pay the sum of five hundred and fifty dollars per month or $275 per child for the two children, plus an additional one hundred dollars per month which would be applied to the arrearages, which is agreed to be $3,969 ... (p. 3)

The Judge directed that the transcript be sent to the originating jurisdiction with a request that claimant be notified and given twenty days in which to respond if she disagreed with the order. She did not respond. Thus, as of May 27, 1983, the arrearages were $3,969.00. Nothing was introduced into evidence to persuade us that this was not the correct amount of arrearages. A Pennsylvania court would give full faith and credit to the arrearages and hence would not enter subsequent orders modifying that amount.

### 2) Prospective Child Support Payments

■ Debtor's second point is that the Pennsylvania orders served to modify prospectively his child support obligation. In other words, he argues that once a lower Pennsylvania order was entered, arrears ceased accumulating on the Georgia order and began to accumulate only under the Pennsylvania order. We agree. Unlike orders setting arrearages, orders establishing child support issued by Georgia courts are not final orders because they are modi-

---

applied that same rule in their attempts to determine modifiability. In any event, the balance of the case law on the subject, including another Superior court decision and a Pennsylvania Supreme Court decision, suggests that modifiability is determined using the law of the foreign jurisdiction.

11. This is consistent with Georgia law. *Brookins v. Brookins,* 257 Ga. 205, 357 S.E.2d 77 (1987) (an order rendered by a responding court in a URESA proceeding is not res judicata in a subsequent action for arrearage under the original support order); *Baird v. Hermann,* 181 Ga. App. 579, 353 S.E.2d 75 (1987) (party not precluded from collecting as arrearages have accumulated).

fiable. *See* O.C.G.A. § 19–6–19;[12] Ga. Code Ann. § 30–220 (Harrison 1981). *Accord, Haselden v. Haselden*, 255 Ga. 366, 338 S.E.2d 257 (1986); *Skinner v. Skinner*, 252 Ga. 512, 314 S.E.2d 897. Hence, a Pennsylvania court would not be required to give Full Faith and Credit to and could modify the prospective application of the Georgia child support order. In other words, they could modify the Georgia obligation to pay support during the period subsequent to the setting of the arrears on May 27, 1983.

■ We must determine debtor's payment obligation in the period after the Pennsylvania bench order setting the arrears under the Georgia order. The Georgia order continued in existence, along with a *new* Pennsylvania order establishing a lower support obligation. Did the May 6, 1983 bench order "otherwise specifically provide" that from that point forward *only* the Pennsylvania orders would govern child support? We have searched in vain for case law precedent. The May 6, 1983 bench order was the result of a hearing at which claimant was represented by the District Attorney. It was characterized as a "consent" order. *See* May 6, 1983 bench order. Claimant did not object to its terms. Accordingly, we find that the order "otherwise specifically provided" that arrears would stop running under the Georgia statute and from that point forward be calculated under the Pennsylvania statute.

As we have explained above, the total arrearages were $3,969 as of May 27, 1983. From that point until the date of the filing of the bankruptcy petition (August 13, 1985), debtor was obligated to pay child support at the lower rates set by the Pennsylvania court. During this period, arrearages were not accumulated under the Georgia order, but could accumulate under the Pennsylvania order. Unfortunately, the exact dollar figure owed by debtor based on this analysis is not clear from the record. Accordingly, we ask that the parties submit, within twenty (20) days of the date of this order, their calculations of the arrears owed under the Pennsylvania support orders *alone*, from May 27, 1983 (the date the Georgia arrears were set) to August 13, 1985.

### 3) Alimony

■ Paragraph 8 of the Judgment on Issues Reserved provides:

> After payment to Plaintiff of the $200.00 arrearage referred to in the first paragraph of this Judgment, the Defendant shall thereafter pay to the Plaintiff, as alimony for her own support and maintenance, the sum of Nine Hundred ($900.00) Dollars per month. Said payments shall be made to Plaintiff on the 1st day of each month for a period of seven (7) years beginning July 1, 1981, or until July 1, 1988.

(The "first paragraph" requires debtor to pay claimant $200.00 representing the balance of temporary alimony remaining due and owing under the April 10, 1981 order). Again, debtor does not dispute that these are payments in the nature of alimony, pursuant to § 523(a)(5), but rather that this amount was modified by the Pennsylvania

---

**12.** When the state court proceedings were progressing, this section read:

§ 19–6–19. Revision of judgment for permanent alimony or child support, generally—When authorized; petition and hearing; cohabitation with third party as ground for revision; attorney's fees; temporary modification pending final trial.

(a) The judgment of a court providing permanent alimony for the support of a spouse rendered on or after July 1, 1977, shall be subject to revision upon petition filed by either former spouse showing a change in the income and financial status of either former spouse. The judgment *of a court providing permanent alimony for the support of a child or children rendered on or after July 1, 1977,* *shall be subject to revision upon petition filed by either former spouse showing a change in the income and financial status of (the former spouse liable for such alimony).* In either case a petition shall be filed and returnable under the same rules of procedure applicable to divorce proceedings. *No petition may be filed by either former spouse under this subsection within a period of two years from the date of the filing of a previous petition by the same former spouse.*

O.C.G.A. § 19–6–19 (emphasis and parenthetical added). Amendments effective in 1986 changed the parenthetical material to allow for a change in the income or financial status of either spouse.

URESA orders. *See* "Debtor's Response to Post–Trial Order," para. 1. Debtor's own exhibits suggest that he is wrong. As Judge Ludwig noted in the May 6, 1983 Pennsylvania bench order, a copy of which is attached to debtor's memorandum, the issue of alimony was not before the Pennsylvania courts; the URESA action was filed to collect child support. Further, we find absolutely no evidence that the parties intended that these alimony payments be used for anything other than the support of claimant. Accordingly, we find that the sum of $48,600.00 [13] represents non-dischargeable alimony.

### 4) Attorneys Fees

■ Claimant posits that a total of $6,000.00 in attorneys fees are non-dischargeable, representing fees ordered in the April 10th, August 21st and November 24th orders. *See* Joint Response. The majority of the courts considering the dischargeability of attorney's fees have decided that they are non-dischargeable. At one end of the spectrum are those cases in which the payments of the attorneys fee portion of the debt is part of a property settlement agreement. *See generally, Mancuso v. Kloss (In re Kloss)*, 29 B.R. 720, Bankr.L.Rep. para. 69, 188 (Bankr.M. D.Pa.1983) (debt held non-dischargeable— no evidence that the fees were part of the property settlement agreement); *Stanzione and Stanzione v. Shenewolf (In re Shenewolf)*, 27 B.R. 187 (Bankr.M.D.Pa. 1982) (no evidence that these fees were given to consummate a property settlement). At the other end are those cases in which, due to the non-breadwinner spouse's financial circumstances, the fee award was intended to help that spouse meet living expenses. *See generally, Williams v. Williams*, 703 F.2d 1055, 1057 (8th Cir. 1983) (wife was in poor health, unemployed and with expenses not met by her income); *Marks v. Catlow*, 663 F.2d 960 (9th Cir. 1981) (interpreting § 17(a)(7) of the Act).

We begin with the litany outlined in *Miller* and *Calhoun*. The parties have

presented no evidence of their intent with regard to the attorney's fees portion of the state court order. The Judgment on Issues Reserved covers property settlement, custody, support and alimony, and awards claimant attorney's fees for representation "herein." The April 10th and November 21st orders have not been admitted into evidence. Under the circumstances, we lack the necessary evidence to conclude that the attorney's fees were so intimately connected with the original order that they should be considered in the nature of alimony, maintenance and support. *Cf. In re Allshouse*, 34 B.R. 512, 515.

We suspect that we might have reached a different conclusion had we been presented with a fuller evidentiary record. We also suspect that it was debtor's disregard of his support duties that caused the issuance of these fee awards. Such equitable considerations may not sway us, however, because they do not flow from the record.

### 5) Income Taxes

■ The parties were liable on an income tax obligation arising from the filing of a joint return. Claimant alleges that the Temporary Order dated April 10, 1981 required that debtor pay this joint debt, and that that order was repeated in the November 24, 1981 contempt order. Neither of these documents has been formally admitted into evidence. Claimant alleges that debtor's failure to pay resulted in the IRS levying on the sum of $3,393 held in claimant's account.

Again, we must focus of the intent of the parties in ascertaining whether this debt is dischargeable. Although assumption of a joint tax obligation will normally ease the other spouse's financial burden, this fact alone is not dispositive:

> A debtor's promise to hold the other spouse harmless in the repayment of any joint debt will always tend to ameliorate the spouses financial condition, but unless the spouse bears the burden of proving that the debt is more akin to alimony,

---

**13.** Paragraph 5 of the Joint Response indicates that $48,800.00 is the total amount of alimony, while the exhibit attached to that document indicates that the correct amount is $48,600. Calculating 54 months at $900 each, we find that the latter figure is correct.

maintenance or support, rather than a mere distribution of property, the debt will be discharged.

*In re Alloway*, 37 B.R. 420, 426. In *Alloway*, the parties had stipulated that the tax lien payment was necessary to allow wife to support a home for herself and their child. *Id.* at 422. But the court noted that these was a lack of evidence in the record concerning the wife's income, needs or expenses. *Id.* at 426. The court held that the wife had failed to meet her burden of showing that the debt was nondischargeable. *Id.* at 426.

Not surprisingly, intent analysis often rests on the non-moving spouse's testimony. *See e.g., Brown v. Brown (In re Brown)*, 36 B.R. 103, 105 (Bankr.D.Kan. 1983) (wife's testimony that she would not have accepted debtor's low child support offer had he not agreed to pay joint debt); *MacDonald v. MacDonald (In re MacDonald)*, 69 B.R. 259, 278 (Bankr.D.N.J. 1986) (wife's testimony that she would not have signed the support agreement had husband not agreed to assume a joint marital debt).

Again, the three orders that we consider part of our trial record do not go to the issue of the intent of the parties with regard to these tax obligations. Claimant has not met her burden of proving non-dischargeability. Although a more complete record might have prompted a different conclusion, in this case we must find that this income tax obligation is dischargeable.

### 6) Obligation to Maintain Life Insurance Premiums

■ The August 21, 1981 Judgment on Issues Reserved provides:

5. The Defendant having testified under oath that he now has a total of $300,-000.00 in life insurance in one or more policies with the Prudential Insurance Company of America and with State Farm Insurance Company, he is hereby ordered and directed to take such action forthwith as may be necessary to name *Marilee C. Pollock, Kathleen Pollock, John Christopher Pollock, III* and *Elizabeth Pollock* as primary and sole beneficiaries of each of said policies of life insurance, share and share alike, with Marilee C. Pollock being designated as Natural Guardian of each of the children should any amount or amounts become due and payable under said policies prior to the time when all three (3) of said children reach eighteen (18) years of age.

The Defendant is further ordered to furnish to the Plaintiff, through her attorney, the policy numbers, face amounts and name of the company issuing each of said policies of insurance together with evidence from each of said policies of insurance, together with evidence from each of the companies involved that the beneficiaries designations as herein prescribed have in fact been made. The Defendant shall continue hereafter to keep each of said policies in full force and effect, shall pay the premiums on each of the same as and when due, shall not allow any one or more of said policies to lapse, and shall not borrow on or otherwise encumber any one or more of said policies in any manner whatsoever. A copy of this Judgment shall authorize each of said insurance companies to furnish to Mrs. Marilee C. Pollock any information concerning said policies which she may from time to time request.

Although obligations to maintain life insurance premiums are generally viewed as non-dischargeable, the analysis supporting this conclusion is wide-ranging. Some courts find such debts non-dischargeable based on the intent of the parties, relying on the first prong of the *Calhoun* test. *See e.g., In re Pitzen*, 73 B.R. 10 (Bankr.N. D.Oh.1986). Others determine intent by applying the boarder tests enunciated by other courts. *See e.g., In re Stone*, 79 B.R. 633, 16 B.C.D. 971, Bankr.L.Dec. para. 72,-033 (Bankr.D.Md.1987) (applying *Coffman* test to determine mutual intention); *Proctor v. Proctor (In re Proctor)*, 42 B.R. 537, 540 (Bankr.E.D.Mo.1984) (the "obvious" intent of the insurance premium provision was to serve as a measure of security for the child support obligation).

In determining intent, some courts look to the necessity of the premium payments. *See e.g., In re Grijalva*, 72 B.R. 334, 337

(noting that the wife spoke little English and had not worked out of her home, that she was raising three children who were unable to make a significant contribution to their home). Others take a holistic approach, considering the agreement as a whole to determine whether the insurance payments were security for the payment of support and maintenance. *In re Proctor*, 42 B.R. 537; *Lineberry v. Lineberry*, 9 B.R. 700, 709 (W.D.Mo.1981).

We do not have the benefit of claimant's testimony on the issue of intent. But the evidentiary record odes include the August 21, 1981 Judgment on Issues Reserved, which names claimant and the children as beneficiaries. It allows claimant to check at any time to determine whether the policies are still being maintained. It names claimant as guardian, which would allow her to manage the funds in the event of debtor's death before the 18th birthday of any of the children. We note also what the Judgment on Issues Reserved did *not* include. It did *not* require claimant to make payments on the policy, paying, as it were, for the ultimate property right embodied in the death benefit. Instead, the Judgment required husband to make this payment. Under the circumstances, on admittedly scanty evidence, we find that the parties intended that these premium payments be in the nature of alimony, maintenance or support. Applying *Calhoun*, we note that although no evidence regarding the annual premiums on these policies was introduced, we cannot conceive that these payment should debilitate debtor, especially in light of our holdings in the other portions of this opinion. Similarly, the support provided by the payment of these insurance premiums is not unreasonable. As we have been presented with no evidence suggesting that any portion of this insurance obligation be segregated, we find the total amount non-dischargeable.

The attached order requires the parties to designate *jointly* certain dollar amounts relating to the figures discussed in this opinion, for the purpose of allowing this court to enter a more specific order at a later date.

## INTERIM ORDER

AND NOW this 21st day of September, 1988, it is hereby ORDERED that the following portions of Marilee C. Pollock's proof of claim are hereby DISALLOWED and held DISCHARGEABLE:

1) the portion representing joint tax obligations;

2) the portion representing attorney's fees;

It is FURTHER ORDERED that the following portions of Marilee C. Pollock's proof of claim are hereby ALLOWED and declared NON–DISCHARGEABLE:

1) the portion representing alimony arrearages;

2) the portion representing unpaid life insurance premiums;

3) the portion representing the $3,969.00 in arrearages owed under the Georgia orders as of May 27, 1983;

4) the portion representing child support arrearages accumulated subsequent to May 27, 2983 under the Pennsylvania support orders, totaling an amount to be determined by future order, after submission by the parties of additional documentation in accordance with this opinion.

It is FURTHER ORDERED that the parties submit, within twenty (20) days, a document captioned "Second Joint Stipulation" in which they identify and quantify the amount of arrearages owed by debtor under the Pennsylvania support orders, for the period running from May 27, 1983 to August 13, 1985, for the purpose of allowing this court to enter a final order declaring that sum ALLOWED and NON–DISCHARGEABLE.