**In re Christopher F. SWEENY, Debtor.**

**Susan S. SWEENY, Plaintiff,**

v.

**Christopher F. SWEENY, Defendant.**

Bankruptcy No. 5–87–00663.
Adv. No. 5–87–0192.

United States Bankruptcy Court,
D. Connecticut.

April 14, 1989.

Daniel Malloy, Gino D. Serpe, Abate & Fox, Stamford, Conn., for plaintiff.

Donald R. Kiefer, Lane, Kiefer & MacRae, Greenwich, Conn., for defendant.

### MEMORANDUM AND DECISION ON DISCHARGEABILITY UNDER CODE § 523(a)(5)

Alan H.W. SHIFF, Bankruptcy Judge.

The plaintiff, former wife of the debtor-defendant, seeks a determination that a hold harmless obligation, provided for in a separation agreement incorporated into a dissolution decree by the Connecticut Superior Court, is nondischargeable under Code § 523(a)(5)(B) as a debt in the nature of alimony, maintenance, or support.

### BACKGROUND

The following facts adduced at trial are undisputed. The plaintiff and the defendant were married on August 28, 1976. For a short period they lived in New York and then moved to Stamford, Connecticut, where they resided in a home owned by the plaintiff's father (the "residence"). After paying rent for an unspecified period, the plaintiff's father sold the residence to them

for approximately $90,000 less credit for the rent paid to the date of sale. The balance was paid with proceeds from a $50,000.00 first mortgage in favor of People's Savings Bank and a $25,000.00 note[1] in favor of the plaintiff's father.[2] Title to the property was put in the plaintiff's name only.[3]

At the time of their marriage, the defendant was a partner and the manager of a restaurant known as Tracks. In August, 1984, a restaurant known as Applause was opened in which the defendant also had a management and ownership interest. On an unspecified date, a $25,000.00 second mortgage was given in favor of People's Savings Bank on the residence, and the proceeds were used for Applause. On July 31, 1984, the defendant executed a $370,-000.00 note on behalf of Applause in favor of Citytrust. *Plaintiff's Exhibit 1.* The $370,000.00 note was guaranteed by the parties, the defendant's business partners, and one other partner's wife, *Plaintiff's Exhibit 2,* and secured by a third mortgage on the residence.[4] The defendant's obligation to hold the plaintiff harmless in connection with that $370,000.00 note, *see infra* at 193–194, is at the center of this controversy.

On or about October 1, 1984, the defendant left the plaintiff, who thereafter instituted a marriage dissolution action. On August 13, 1985, they entered into a separation agreement, and on September 13, 1985, a dissolution decree entered, incorporating the terms of that agreement, which in relevant part provides:

## ARTICLE II—ALIMONY

2.1 Commencing September 1, 1985, the HUSBAND shall pay to the WIFE during his lifetime and until her death or remarriage, as hereinafter defined, or until August 31, 1988, whichever first occurs, as periodic alimony, the sum of $1,317.00 per month on the first day of each and every month. The payments shall be made in equal monthly installments on the 1st of each and every month and said payments are to be in cash. The HUSBAND has no obligation to make any payments after the death of the WIFE.

2.2 The HUSBAND, at his election, may pay the above alimony directly to the following mortgagees:

Peoples Savings Bank, first mortgage, in the monthly amount of $756.00;

Peoples Savings Bank, second mortgage, in the monthly amount of $330;

Henry Sepasanski [plaintiff's father] in the monthly amount of $231.

. . . .

## ARTICLE IV—DIVISION OF PROPERTY

4.1 The parties acknowledge that a mutually satisfactory division has been made between them of all real and personal property owned by them or either of them, including any interests that each may claim to have against the other by reason of their marriage. Hereafter, each party shall own, free of any claim by the other, all items of property of every kind which are now owned by him or her, and each party shall be free to dispose of the same as if he or she were unmarried except as provided herein. All property, both real and personal, now owned by the respective parties, whether acquired prior or subsequent to the marriage of the parties, shall remain their sole and separate property except as follows:

. . . .

1. The plaintiff testified that her father took back a mortgage. It appears, however, from the financial affidavits furnished in connection with the divorce action that the note was not secured by a mortgage. *Plaintiff's Exhibits 4 and 5.*

2. According the plaintiff's unrefuted testimony, her father sold the property for less than its market value of approximately $135,000.00 in an effort to help them.

3. The plaintiff's June 18, 1985 financial affidavit furnished in connection with the divorce action states that she was the sole owner of the property, *Plaintiff's Exhibit 4,* while the defendant's June 6, 1985 affidavit states that he had a ½ interest. *Plaintiff's Exhibit 5.*

4. The plaintiff also guaranteed a note in favor of Citytrust for $85,000, which was borrowed by the Tracks restaurant. That note and guaranty are not involved in this proceeding.

4.3 The parties hereby acknowledge that the record ownership to the real estate located at 45 Downs Avenue, Stamford, Connecticut, is solely in the WIFE's name and the HUSBAND hereby releases to the WIFE any and all claims that he may have, if any, in and to said real estate.

4.4 Commencing September 1, 1988, the WIFE agrees to assume all liability for the 1st and 2nd mortgage due to Peoples Savings Bank, and the note due to HENRY SEPASANSKI. Between the signing of this agreement and September 1, 1988, both parties shall be liable for the 1st and 2nd mortgages due to Peoples Savings Bank and the note due to HENRY SEPASANSKI, except however, the HUSBAND shall have the right to pay these amounts directly or by way of alimony payments as set forth in paragraph 2.1 and 2.2 herein.

4.5 The parties herein recognize that the HUSBAND has executed a certain note as co-guarantor to Citytrust in the principal amount of $370,000 and 85,000 and that these monies were utilized by the HUSBAND for the purchase and operation of his restaurant businesses, and that the marital residence is security for the payments of said notes, as reflected in a certain security agreement by and between Susan S. Sweeny and Citytrust dated July 31st 1984 and recorded Aug 1st, 1984 in Volume 2431 at Page 172–173 and 177 on the Stamford Land Records. The HUSBAND agrees to indemnify and save the WIFE harmless from any and all liabilities arising from this obligation including, without limiting the foregoing to principal, interest and attorney's fees. HUSBAND agrees to utilize his best efforts to remove said security instrument from the land records by either obtaining a release, or substituting the collateral. In the event the WIFE desires to sell said property, the HUSBAND agrees to obtain a surety bond if necessary, to obtain a release of this security instrument.

ARTICLE V—LIFE INSURANCE

5.1 The HUSBAND agrees to obtain and maintain a life insurance policy or policies in the amount of $75,000 payable to the WIFE as beneficiary, which obligation shall terminate upon the WIFE's death, remarriage, or until the collateral note referred to in paragraph 4.5 herein is released, or the wife's real property is sold, whichever shall first occur.

. . . .

ARTICLE VIII—MUTUAL RELEASES

. . . .

8.2 The obligations under this agreement shall survive the death of the HUSBAND and of the WIFE. All of the covenants, promises, stipulations, agreements and provisions herein contained shall apply to bind and be obligatory upon the heirs, executors, administrators, personal representatives and assigns of the HUSBAND, and the WIFE hereto, whether so expressed or not.

*Plaintiff's Exhibit 3.* The evidence further discloses that at the time of the judgment, the plaintiff worked for a commercial photographer and earned between $10,000 and $15,000 annually,[5] that the defendant had a gross annual income of between $37,000 and $60,000,[6] and that both parties were apparently in good health.

## DISCUSSION

Obligations intended for the support and maintenance of a spouse are in the nature of alimony and are not dischargeable,

---

**5.** There is some confusion as to the amount. The financial affidavit filed by the plaintiff in the divorce proceeding and her pretrial brief in this proceeding specify that she was grossing approximately $15,000 annually. *Plaintiff's Exhibit 6; Plaintiff's Pretrial Brief at 5.* At trial, the plaintiff testified that her gross annual income at the time of the judgment was approximately $10,000 to $11,000. *Transcript of October 12, 1988 Hearing at 15.20.*

**6.** The financial affidavit filed by the defendant at the time of the divorce states that he was making approximately $37,000 annually. *Plaintiff's Exhibit 7. See also Plaintiff's Pretrial Brief at 5.* At trial, the plaintiff maintained that the defendant was earning approximately $45,000 at the time of the divorce, *Tr. at 15,* while he admitted making approximately $60,000. *Tr. at 44.*

§ 523(a)(5)(B),[7] in contrast to obligations intended to sort out and divide property, which create a debtor-creditor relationship and are dischargeable. *See Forsdick v. Turgeon,* Civ. No. H–85–378 (TEC), slip op. at 5 (D.Conn. May 13, 1986), *aff'd,* 812 F.2d 801 (2d Cir.1987). The burden is upon the plaintiff to prove by clear and convincing evidence that the debt arising from the hold harmless obligation is not dischargeable. *Seepes v. Schwartz (In re Schwartz),* 45 B.R. 354, 357 (S.D.N.Y.1985); *Sehring v. White (In re White),* 84 B.R. 818, 821 (Bankr.M.D.Fla.1988).

The plaintiff points to her state court financial affidavit, *Plaintiff's Exhibit 4,* and argues that her income was inadequate to maintain the residence without indemnification from liability on the $370,000.00 note. She further contends that the hold harmless obligation in paragraph 4.5 of the agreement, together with the periodic payments under paragraph 2.1 and insurance under paragraph 5.1, was intended provide for her support and maintenance. The defendant admits that his insurance obligation, which was to terminate, *inter alia,* upon the plaintiff's death or marriage, was intended to protect her from "someone coming and taking her house." *Transcript of October 12, 1988 Hearing at 49.*

The defendant argues that the separation agreement is a clear expression of the intent of the parties that each was to have all real and personal property now owned by them, so that he was to have his restaurants and she was to have her home free of any claim by the other, *Plaintiff's Exhibit 3, ¶ 4.1,* and that the hold harmless obligation was intended to implement that division of property. Under that scenario, the plaintiff gave up an interest in the restau-

rants in consideration for the defendant's release of "any and all claims that he may have, if any, in and to [the residence]...." *Id* ¶ 4.3. The defendant also argues that the hold harmless obligation survives the plaintiff's death, *id.* ¶ 8.2, and is therefore distinguishable from alimony.[8]

Whether the hold harmless obligation is in the nature of alimony, maintenance, or support or a division of property is a question of bankruptcy law to be determined by this court with appropriate reference to state law. The critical inquiry is directed at the intention of the parties and the substance of the obligation. *Pauley v. Spong (In re Spong),* 661 F.2d 6, 8–9 (2d Cir.1981); *Freyer v. Freyer (In re Freyer),* 71 B.R. 912, 916 (Bankr.S.D.N.Y.1987). In arguing that the hold harmless obligation was intended as a division of property, the defendant emphasizes its location in the Division of Property section of the separation agreement. But, as this court observed in *Brown v. Brown (In re Brown),* 74 B.R. 968, 972 (Bankr.D.Conn.1987), "it is generally recognized that the issue of dischargeability raises questions of fact, requiring inquiry beyond the four corners of the document." *See also Sehring, supra,* 84 B.R. at 822; *Robbins v. Mizen (In re Mizen),* 72 B.R. 251, 252–53 (Bankr.N.D.Ohio 1987) ("[T]he Bankruptcy Court is not required to accept the terms of a divorce decree as determinative as to whether particular obligations are property settlements, or, alternatively, in the nature of alimony, maintenance, or support."). Thus, while the location of the hold harmless obligation in the separation agreement is significant, that factor is by no means determinative of the dischargeability issue presented here. Similarly, the survival of the hold harmless

**7.** Code § 523(a)(5)(B) provides in pertinent part:

  (a) A discharge under section 727 ... of this title does not discharge an individual debtor from any debt—

  ....

  (5) to a spouse, former spouse, or child of the debtor, for alimony to, maintenance for, or support of such spouse or child, in connection with a separation agreement, divorce decree or other order of a court of record, determination made in accordance with State or territorial law by a governmental unit, or property

settlement agreement, but not to the extent that—

  ....

  (B) such debt includes a liability designated as alimony, maintenance, or support, unless such liability is actually in the nature of alimony, maintenance, or support....

**8.** The agreement is silent as to whether the hold harmless obligation terminates upon the plaintiff's remarriage. *Plaintiff's Exhibit 3, ¶¶ 4.5, 8.2. Compare id. ¶¶ 2.1, 5.1.*

**196**

obligation after the plaintiff's death, while significant, does not foreclose a finding that its primary function was to provide her with maintenance and support. *See In re Pollock*, 90 B.R. 747, 754 (Bankr.E.D.Pa. 1988). In the final analysis, it is the function of the obligation not the form of the document in which it appears or its duration that governs.

Having assessed the credibility of the parties and the documents received in evidence, I am convinced that the hold harmless obligation is in the nature of alimony. The plaintiff's home is the focus of the defendant's support obligation in paragraph 2.1 of the separation agreement. It is clear from that obligation that the defendant recognized that the plaintiff needed support for a period of time to make mortgage payments. It is undisputed that the plaintiff could not afford to pay the $370,-000.00 note and that it was never intended that she be exposed to the risk of losing the residence on account of that note. The defendant's obligation under paragraph 5.1 to obtain and maintain a $75,000.00 life insurance policy was, by his admission, intended to protect her from losing the residence if, upon his death, Citytrust were to look to her for payment. It is clear that the hold harmless agreement was intended for the same purpose and not, as the defendant asserts, merely a provision to implement reciprocal releases of respective property interests.

The defendant's argument is essentially based on the claim that the plaintiff had an interest in the restaurants which she released as part of "a mutually satisfactory division ... of all real and personal property owned by them...." *Plaintiff's Exhibit 3, ¶4.1.* To buttress that argument the defendant attempted to prove that the plaintiff was involved in restaurant management decisions, that she invested $25,000.00 in the business, and that she received 50% of the tax benefit from a business tax loss carry forward. That argument lacks candor.

The plaintiff never had a management position in the restaurants. At most it was revealed that on occassion she met with an interior designer and commented upon suggested pictures for the restaurants. Her employment as a waitress or receptionist was for minimum wages and could be terminated at the sole discretion of the defendant. The $25,000.00 People's mortgage, like the others, was placed on the residence at the request of the defendant who convinced her to encumber the residence so that money would be available for his business. The suggestion that the money was an investment by her in the business is a transparent attempt to distort the true nature of the transaction, perhaps best illustrated by the defendant's January 31, 1984 affidavit to the Connecticut Liquor Control Commission in which he stated "I am investing the sum of $25,000.00 as my share of the capital contribution for said [Applause] restaurant." *Plaintiff's Exhibit 7.* Similarly, the suggestion that the plaintiff's share of a tax credit proves that she had an interest in the restaurants is unavailing. The parties filed joint tax returns. The plaintiff's income was approximately 20% of the gross family income. The fact that the plaintiff derived a benefit from a tax credit attributable to a business loss in no way supports the contention that she had an interest in the business. Perhaps the clearest refutation of the defendant's position is his sworn statement to the Connecticut Liquor Control Commission that "My wife does not now have nor will she have at any future time any interest whatsoever in the restaurant known as Applause or in FLX, Inc." *Plaintiff's Exhibit 7.*

For the foregoing reasons, I conclude that the parties intended the debt, arising out of the $370,000.00 hold harmless obligation, to be in the nature of alimony, maintenance, or support, the debt is nondischargeable under Code § 523(a)(5)(B), and IT IS SO ORDERED.